UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SIRHAN B. SIRHAN,

          Plaintiff,

     v.

GEORGE GALAZA ET AL.,

          Defendant.

Case No. CV 00-05686 BRO (AJWx)

**ORDER RE: ACCEPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.   INTRODUCTION

"This case may be the final chapter in an American tragedy."  (Dkt. No. 215 at 1.)  Petitioner Sirhan B. Sirhan asks this Court to sustain his objections to the Magistrate Judge's Report and Recommendations filed in his case and hold an evidentiary hearing based upon his claim of actual innocence.  This Court conducted a de novo review of Petitioner's objections.  As explained below, Petitioner has failed to meet his burden of establishing actual innocence.  Likewise, Petitioner has failed to demonstrate that he falls within the narrow exception warranting an evidentiary hearing at this stage.  Accordingly, Petitioner's objections are hereby OVERRULED.

**II. PROCEDURAL HISTORY**

On May 25, 2000, Sirhan B. Sirhan ("Petitioner") filed a habeas corpus petition in the United States District Court for the Central District of California, Western Division.  (Dkt. No. 1.)  The matter was assigned to Magistrate Judge Andrew J. Wistrich.  (Dkt. No. 2.)  On August 18, 2000, District Judge Consuelo B. Marshall denied Petitioner's motion to recuse all district and magistrate judges in the Central District of California.  (Dkt. No. 13.)  On November 30, 2000, Judge Marshall denied Petitioner's motion for reconsideration.  (Dkt. No. 24.)  Judge Marshall then denied Petitioner's motion for certification to file an interlocutory appeal on March 28, 2001, and the United States Court of Appeals denied Petitioner's request for a writ of mandamus on May 20, 2001.  (Dkt. Nos. 37, 47.)

On December 6, 2001, in accordance with extended time granted during the course of Petitioner's recusal action, Respondents supplemented their answer to Petitioner's habeas petition, arguing that the petition was barred as untimely based upon Petitioner's habeas petition denied by the California Supreme Court in 1997.  (Dkt. No. 38.)  Judge Wistrich granted Petitioner extensions of time to respond until July 14, 2003.  (Dkt. No. 55.)

On June 18, 2003, Petitioner moved to recuse Judge Wistrich or to transfer the case to the Eastern District of California.  (Dkt. No. 56.)  District Judge Christina A. Snyder granted Petitioner extensions of time and denied Petitioner's motion for recusal or transfer on July 7, 2004.  (Dkt. No. 81.)  On February 16, 2005, Judge Snyder denied Petitioner's motion for reconsideration.  (Dkt. No. 91.)

On August 4, 2005, the Court received notice that Petitioner's counsel was deceased.  (Dkt. No. 96.)  Judge Wistrich granted extensions of time until 2007, in consideration of Petitioner's new counsel.  (Dkt. No. 102.)

On March 13, 2007, Respondents filed a motion to dismiss Petitioner's federal habeas petition based on the timeliness argument advanced in Respondents' 2001 supplemental answer.  (Dkt. No. 106.)  On June 21, 2007, Petitioner's counsel

withdrew from the case, and counsel appearing for Petitioner pro hac vice filed six motions seeking an extension of time for Petitioner to respond.  (Dkt. Nos. 111, 133.) Petitioner timely filed his opposition on October 28, 2010, asserting that Petitioner's actual innocence excepts him from the statutory limitation that otherwise would have begun to run upon denial of Petitioner's state habeas petition.  (Dkt. No. 135.)

Judge Wistrich granted Petitioner multiple extensions of time and, having reviewed Petitioner and Respondents' filings,[1] recommended the dismissal of Petitioner's habeas matter on December 28, 2012.  (Dkt. No. 198.)  On April 3, 2013, Petitioner timely filed his objection, and Judge Wistrich affirmed his report and recommendation of dismissal on August 26, 2013.  (Dkt. No. 207, 216.)  The matter was assigned to this Court on May 10, 2013.  (Dkt. No. 212.)  This Court now considers Petitioner's September 29, 2013 objections to Judge Wistrich's affirmed report and recommendation to dismiss.  (Dkt. No. 218.)

Pursuant to 28 U.S.C. § 636, this Court has reviewed the Petition and other papers along with the attached Report and Recommendation of Judge Wistrich.  The Court has also reviewed Petitioner Sirhan Bishar Sirhan's objections and Respondent George Galaza's response.  Having so considered the significant number of filings and orders predating the Court's receipt of this matter, the Court makes its determination de novo.

_____

[1] On February 23, 2011, Judge Wistrich ordered Petitioner to prepare a supplemental brief to substantiate his opposition to Respondents' motion to dismiss.  (Dkt. No. 137.)  On August 29, 2011, Judge Wistrich ordered Respondents to prepare a supplemental brief in light of the Ninth Circuit's decision in *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011), regarding equitable tolling.  (Dkt. No. 171.)

Prior to Petitioner filing his supplemental brief on April 23, 2011, Judge Snyder issued an order on April 11, 2011, to temporarily restrain Nate Sanders and Michael McCowan from selling certain documents Petitioner prepared at the direction of McCowan, who had served as Petitioner's investigator during the course of the instant habeas proceedings.  (Dkt. No. 148.)  Judge Snyder issued a preliminary injunction against McCowan and Sanders on April 25, 2011.  (Dkt. No. 155.)

As is discussed below and in the Report and Recommendation, Petitioner's habeas petition is untimely and fails to present evidence falling within the exception for actual innocence. The limitation period was not statutorily tolled during the pendency of the petitions filed in the California Court of Appeal or California Supreme Court. *See Allen v. Siebert*, 552 U.S. 3, 6–7 (2007) (holding that a petition is not properly filed for purposes of statutory tolling if it is denied as untimely by state courts). Petitioner argues that he is entitled to equitable tolling because he has submitted evidence of actual innocence that was not presented at trial. (Dkt. No. 218 at 4.) Accordingly, Petitioner argues that the limitation period did not begin until the date on which he knew or should have known the factual basis for his claims. *See* 28 U.S.C. § 2244(d)(1)(D).

On August 26, 2013, Judge Wistrich filed a sixty-seven-page Report and Recommendation. (Dkt. No. 216.) On September 28, 2013, Petitioner filed a revised sixty-page brief detailing his objections. (Dkt. No. 218.) Having reviewed the evidence and filings in this case, the Court agrees with Judge Wistrich that Petitioner failed to meet the showing required for actual innocence. Accordingly, the Court adopts the Report and Recommendation from below and OVERRULES Petitioner's objections. The Court will separately address Petitioner's objections below. In addition, the Court DENIES Petitioner's request for an evidentiary hearing.

### III. LEGAL STANDARD

"The United States District Court for the Central District of California issued General Order 01-13, which fills in specific additional duties assigned to magistrate judges. Federal habeas corpus petitions and extradition proceedings are among the types of cases assigned to magistrates." *Wang v. Masaitis*, 416 F.3d 992, 999 (9th Cir. 2005). After being served a copy of the magistrate judge's Report and Recommendation, "any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C.

§ 636(b)(1)(C). The district court's role in reviewing a magistrate judge's report and recommendation is set forth in 28 U.S.C. § 636(b)(1). The Court, after conducting its own de novo review, "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* The party making objections bears the burden of specifically identifying the portions of the report and recommendation to which it objects. *See, e.g.*, *United States v. Remsing*, 874 F.2d 614, 616 (9th Cir. 1989) ("[district court's] function is to correct those findings made by the magistrate when the litigant has identified a possible error"). Under Rule 72(b), a district court may accept the findings and recommendations of the magistrate judge which have drawn no objection, provided those findings are not clearly erroneous. *Thomas v. Arn*, 474 U.S. 140, 153–55 (1985).

In *McQuiggin v. Perkins*, the Supreme Court held "that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . [the] expiration of the statute of limitations." 133 S. Ct. 1924, 1928 (2013). To show actual innocence, "an otherwise time-barred habeas petitioner [must] demonstrate[] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Lee v. Lampert*, 653 F.3d 929, 937 (9th Cir. 2011); *accord Schlup v. Delo*, 513 U.S. 298, 329 (1995). After this showing, "the petitioner may pass through the *Schlup* gateway and have his constitutional claims heard on the merits." *Id.* "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

"[W]here post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims." *Lee*, 653 F.3d at 938 (quoting *Sistrunk v.*

5

*Armenakis*, 292 F.3d 669, 673 (9th Cir. 2002) (en banc)).  Nonetheless, "tenable actual-innocence gateway pleas are rare."  *McQuiggin*, 133 S. Ct. at 1928; *accord House v. Bell*, 547 U.S. 518, 538 (2006) ("[I]t bears repeating that the *Schlup* standard is demanding and permits review only in the extraordinary case." (internal quotation marks omitted)).

Petitioner fails to meet the exacting standard set forth in *McQuiggin* and *Lee* to pass through the *Schlup* actual-innocence gateway.  Though Petitioner advances a number of theories regarding the events of June 5, 1968, Petitioner does not dispute that he fired eight rounds of gunfire in the kitchen pantry of the Ambassador Hotel.  (Dkt. No. 218 at 34 ("That he fired his gun eight times is not to be denied . . . .").)  After reviewing the evidence, the Court agrees with the findings of Magistrate Judge Wistrich.  Petitioner does not show that it is more likely than not that no juror, acting reasonably, would have found him guilty beyond a reasonable doubt.  Thus, Petitioner does not fall within the "rare" category of petitioners who may pass through the *Schlup* actual-innocence gateway.

In objection to Judge Wistrich's Report and Recommendation, Petitioner identifies a number of portions of the Report that he believes reveal inconsistencies and deficiencies undermining the Report.  For the following reasons, the Court finds Petitioner's objections to be without merit.

## IV. OBJECTIONS

### A. Eyewitness Testimony

Petitioner disputes the Report's statement that "[i]nstead of shaking Senator Kennedy's hand, Petitioner shot him."  (Dkt. No. 218 at 24; *see* Dkt. No. 216 at 1.)  According to Petitioner, if Petitioner had been facing the Senator so as to shake his hand, he could not have shot the fatal bullet.  (Dkt. No. 218 at 24.)  First, Petitioner cites the autopsy report, which concluded that the fatal bullet was fired in a "very slightly upward angle" from behind.  (Dkt. No. 135 at 43; *see* Dkt. No. 134 at 105.)  Petitioner then points to twelve eyewitness statements that "place[] [P]etitioner in

front of Senator Kennedy when the shooting occurred." (Dkt. No. 135 at 43.)
Finally, Petitioner cites the absence of eyewitness testimony placing "[P]etitioner
behind Senator Kennedy at the time of the shooting." (Dkt. No. 218 at 11–12.)
Having established that he was initially in front of the Senator, Petitioner argues that
it would have been impossible for him to shoot the fatal bullet. Yet Petitioner fails to
address the chaos that ensued once Petitioner began shooting and the subsequent
movements of the Senator and Petitioner in reaction to the shooting.

Establishing that Petitioner was initially in front of Senator Kennedy does not
preclude him from firing the fatal shot. First, eyewitness testimony supports a
finding that Senator Kennedy moved during or after the first shot.[2] (*See* Dkt. No.
180-1 at 5–36; Dkt. No. 153-2 at 5–22, 29–41.) In fact, Mr. Uecker's testimony
described Senator Kennedy as turning his head just as the shots were fired.[3] Second,

---

[2] In statements to the police and Federal Bureau of Investigation ("FBI"), several
eyewitnesses observed the Senator move when the shooting began. Edward
Minasian saw a gunman running or darting toward the Senator before the first shot
and then saw the Senator raise his arm. (Dkt. No. 180-1 at 5–7.) Lisa Urso saw
Petitioner extend his arm and take a step forward before the first shot, (Dkt. No. 153-
2 at 11), and then she saw the Senator stagger forward or backward after the first
shot, (Dkt No. 180-1 at 27–28). Martin Patrusky observed the gunman moving and
extending his hand toward the Senator before the first shot. (Dkt. No. 180-1 at 10.)
Juan Romero saw the gunman reaching toward the Senator and then observed the
Senator place his hands to his face. (Dkt. No. 180-1 at 12.) Karl Uecker did not see
the gunman prior to the initial shots but felt him moving in between him and the
steam table. (Dkt. No. 180-1 at 16.) Mr. Uecker then "heard [] something like a
firecracker" and then "something like a shot." (Dkt. No. 180-1 at 16.) Peter Hamill
noticed the Senator's head was turned prior to the first shot. According to Mr.
Hamill, the Senator was "standing with his body facing in an Easterly direction and
his head was turned to his left in a Northerly direction. His right arm was across his
body and he was shaking hands." (Dkt No. 180-1 at 18.) Mr. Hamill saw the
Senator put his right hand up in the air after the first shot. (Dkt. No. 180-1 at 18.)
Boris Yaro saw the Senator moving in a "protective effort" and the gunman
"lunging" at the Senator. (Dkt. No. 180-1 at 19.)

[3] Petitioner argues that there are "three independent eyewitnesses who clearly
state[d] that the Senator had finished shaking hands," invalidating Respondent's
contention that the Senator was turning his head. (Dkt. No. 218 at 11–12; *accord*
Dkt. No 180-1 at 20–21.) Instead, Petitioner argues that the Senator "was walking
forward clearly, frontally, facing Petitioner." (Dkt. No. 218 at 11–12; *accord* Dkt.
No 180-1 at 20–21.) On direct examination, however, Mr. Uecker testified that
Senator Kennedy's "upright arm was turning" when "[Mr. Uecker] realized there
was somebody following [him] with a gun." (Trial of Sirhan Bishara Sirhan at 3096,

none of the eyewitnesses saw Senator Kennedy sustain the fatal shot.[4]  Any estimates of muzzle distance or the angle of Petitioner's gun were based on the position of the gun either before the shooting began or at the time of the first shot.  While each statement initially places Petitioner in front of Senator Kennedy, they vary in describing the direction and distance between the two individuals.[5]  (*See* Dkt. No. 180-1 at 2–22.)  Third, eyewitness statements paint a chaotic picture, which would

---

*available at* http://www.maryferrell.org/mffweb/archive/getToc.do?docId=99505 &relPageId=1&source=controls_D.jsp (Sept. 16, 2014) (hereinafter "RT").) Additionally, Mr. Uecker testified that as the Petitioner began shooting "[t]he Senator put up his right hand and he started turning around, and while he was turning, there was fighting with [Petitioner]."  (RT at 3101.)

[4] For example, Mr. Hamill saw the Petitioner and the gun, but "he did not see the flashes from the gun nor the Senator being hit."  (Dkt. No. 180-1 at 18.)

[5] Petitioner contends that he could not have caused the fatal shot because the gunpowder burns prove it was a close range shot, and eyewitnesses' statements place him too far away from the Senator in order to cause such wounds.  Eyewitness statements, however, were not consistent in documenting the distance between Petitioner and Senator Kennedy.  Mr. Hamill stated to the Los Angeles Police Department ("LAPD") that the gun was about two feet from the Senator, although he felt that he could be mistaken about the exact distance due to the circumstances.  (Dkt. No. 180-1 at 18.)  Richard Aubry told the LAPD that Petitioner was six or seven feet ahead of the Senator and the newsmen.  (Dkt. No. 180-1 at 22.)  Mr. Romero told the FBI that he

> noticed a man who was to [his] left and who was smiling and who appeared to be reaching over someone in an effort to shake Senator Kennedy's hand.  At about the same time [he] heard gunfire and [he] noticed that this individual was holding a gun in his hand . . . and that the gun was approximately one yard from Senator Kennedy's head.

(Dkt. No. 180-1 at 11-12.)  Further, Mr. Romero's statements place Petitioner very close to Senator Kennedy, explaining to the LAPD that he saw and felt the gunpowder burns.  (Dkt. No. 180-1 at 12.)  During trial, Frank Burns testified that he heard "the noise, the ripple of a gun, and it sounded like firecrackers . . . .  It seemed just like a ripple of noise."  (Dkt. No. 180-1 at 17.)  All Mr. Burns could see "was an arm extended holding a gun" and people in the surrounding area as well as "right next to the serving table."  (Dkt. No. 180-1 at 17.)  Edward Minasian also testified that there was a large group of people around Petitioner.  (Dkt. No. 180-1 at 27.)  The varying descriptions evidence how difficult it would be for an individual to accurately account for the movements and location of Petitioner and the Senator due to the sheer number of people inside of the kitchen pantry as well as the hysteria that erupted after the first shot.

undoubtedly make it difficult for eyewitnesses to gauge the exact locations of Petitioner and the Senator.  All of this evidence was available to Petitioner at the trial.  Even the declaration of Petitioner's new witness, Ms. Nina Rhodes-Hughes, supports this characterization, as she describes how "bullets were flying seemingly everywhere" while a group of men attempted to subdue Petitioner.  (Dkt. No. 218-1 ¶¶ 10–11.)  Ms. Rhodes-Hughes describes how she fainted, was trampled by individuals in the kitchen, awoke with a wet dress, and had one shoe knocked off her foot.  (Dkt. No. 218-1 ¶ 13.)  A jury reasonably may have concluded that witnesses could not be expected to pinpoint the exact location of those two parties in the midst of such chaos.

Additionally, Petitioner takes issue with the Report's statement that "numerous witnesses [saw] petitioner shoot Senator Kennedy."  (Dkt. No. 218 at 24; *accord* Dkt. No. 216 at 2.)  Petitioner argues that the Report contradicts itself because the Report later discloses that "eyewitnesses on whom petitioner relies did not actually see Senator Kennedy get shot."  (Dkt. No. 218 at 24–25; *accord* Dkt. No. 216 at 40.)  As established above, an eyewitness did not testify that he or she saw the fatal shot; eyewitnesses did testify, however, that they were present and saw Petitioner fire his gun.  (*See* Dkt. No. 180-1 at 5–36; *see also* Dkt. No. 153-2 at 29–41.)  Further, Petitioner admits that he "has never, and does not now, deny [sic] that he fired his weapon at the Ambassador Hotel that evening."  (Dkt. No. 135 at 22.)  Due to the overwhelming testimony identifying Petitioner as a shooter, and Petitioner's own admission regarding the use of his gun, a reasonable jury could conclude that Petitioner fired the fatal shot.

As such, the Court finds these objections to the Report and Recommendation to be without merit.

**B. Ms. Nina Rhodes-Hughes's Declaration**

Initially, Petitioner failed to submit a declaration from Ms. Nina Rhodes-Hughes.  Now, attached to his objections, Petitioner provides a recent declaration.[6] A "'district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation.'" *Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002) (quoting *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000)).  The Magistrate Judge considered this evidence in the interest of a thorough analysis.  (Dkt. No. 216 at 49 n.26.)  As explained below, the Court has also considered this late-filed declaration because it was briefed for the Magistrate Judge.  The Court finds that it does not meet the showing required by *Schlup* to demonstrate actual innocence.

Ms. Rhodes-Hughes disputes the location and number of gunfire shots; yet, importantly, she does not assert that Petitioner is innocent.  First, Ms. Rhodes-Hughes's recollection was recorded decades after the events took place, which calls into question its reliability.  (Dkt. No. 195 at 31.)  Second, her declaration confirms that Petitioner was a shooter that evening.  Ms. Rhodes-Hughes states that she was in the kitchen, she saw Petitioner fire his gun, and she witnessed men attempt to subdue him.  (Dkt. No. 218-1 ¶¶ 8–9, 19.)  Ms. Rhodes-Hughes does not state that she saw a second shooter.  (Dkt. No. 218-1 ¶ 9.)  She suggests that there was more than one shooter because she counted twelve to fourteen shots rather than eight, and she testifies that gunfire originated in both the left and right sides of the room.  (Dkt. No. 218-1 ¶¶ 8–10.)  Ms. Rhodes-Hughes avers that she heard only two or three shots coming from the vicinity of Petitioner, while several shots were fired in rapid succession from the opposite direction.  (Dkt. No. 218-1 ¶¶ 8–11.)  It is undisputed,

---

[6] In his opposition to dismiss the habeas petition, Petitioner relied on statements of Nina Rhodes-Hughes, but Petitioner did not provide a declaration from Ms. Rhodes-Hughes and rather relied on an interview from Professor Phil Melanson's book, *Shadow Play*.  (Dkt. No. 195 at 31.)

however, that Petitioner fired all eight rounds of bullets from his gun.  Ms. Rhodes-Hughes's statements are insufficient to meet the actual innocence showing because, although they are inconsistent with other undisputed evidence, they do not exonerate Petitioner.  Even considering these statements, it cannot be said that it is more likely than not that no juror, acting reasonably, would find Petitioner guilty beyond of a reasonable doubt.

### C. Pruszynski Tape Recording

Petitioner objects to the Report's treatment of the Pruszynski tape recording, arguing that the Report fails to address the merits of Phillip Van Praag's recent analysis.  (Dkt. No. 218 at 4–5.)  During the shooting, a reporter named Stanislaw Pruszynski inadvertently left his tape recorder on and as a result captured the incident.  Experts, such as Mr. Van Praag, have since analyzed the tape recording.  Though the Report initially faults Petitioner for failing to exercise diligence in discovering the tape,[7] it also addresses the merits of Mr. Van Praag's analysis.  The Report concludes that this evidence does not meet the showing required by *Schlup* for actual innocence.  The Court agrees.

According to Petitioner, Mr. Van Praag's analysis proves that a second gunman was present.  Mr. Van Praag opines that more than thirteen shot sounds can be identified on the tape recording.  (Dkt. No. 180-1 at 44 ¶ 6(f).)  Additionally, Mr. Van Praag concludes that there were two instances on the tape recording where two

---

[7] In 1993, Rose Lynn Mangan, an investigator for Petitioner, learned that almost all law enforcement records regarding Senator Kennedy's assassination had been released in 1988 to the public as part of the California State Archives.  (Dkt. No. 1 at 200 ¶ 76.)  Petitioner argues that the initial date of its availability for the tape is irrelevant because it was the invention of a sophisticated computer based program that brought new significance to the evidence in 2005.  (Dkt. No. 218 at 4–5.)  The Report does not ignore the technological advances that have led to new analysis of the tape recording.  Rather, the Report notes that the habeas petition was filed in 2000, before the discovery of this technology.  Thus the Report concludes that the recording could not have been a factual predicate to any claim contained in either his state or federal habeas petition.  (Dkt. No. 216 at 12.)

shots were fired very closely in time.  According to Mr. Van Praag, it is unlikely that Petitioner's inexpensive revolver could have fired this rapidly.  (Dkt. No. 180-1 at 44 ¶ 6(f).)  Finally, Mr. Van Praag detected frequency anomalies suggesting that more than one gun was used.  (Dkt. No. 180-1 at 47 ¶ 6(i).)  Petitioner relies heavily on these findings, but Mr. Van Praag's findings have not been universally adopted.

Another expert, Mr. Phillip Harrison, examined a dubbed copy of Mr. Pruszynski's tape recording and concluded that only eight shots were fired.  (Dkt. No. 184 at 3.)  According to Mr. Harrison, the other impulse sounds on the tape recording do not bear any resemblance to a .38 caliber shot, the type of gun carried by a security guard,[8] or a .22 caliber shot, the type of gun carried by Petitioner.[9] (Dkt. No. 185 ¶ 24, App. B at 280–82.)  Mr. Harrison's conclusions are consistent with and corroborate eyewitness testimony.[10]  Petitioner faults Mr. Harrison for bias and for drawing conclusions without knowing the exact positioning of Mr. Pruszynski's microphone.  (Dkt. Nos. 180 at 18–19, 218 at 4–5.)  Similarly,

---

[8] In his declaration, Mr. Van Praag conducted field testing with a .22 caliber Harrington & Richardson 922, assuming it was the "make/model gun owned at the time by a security guard who confirmed to police that he had been armed and had been standing immediately behind and toward the right of Senator Kennedy at the moment the shooting occurred."  (Dkt. No. 180-1 at 46 ¶ 6(h)).  In fact, as Respondent points out, this security guard actually carried a .38 caliber gun with him at the time of the shooting.  (Dkt. No. 184 at 3 n.3.)  As such, Mr. Harrison assessed whether the unaccounted-for impulses on the tape recording matched either a .38 caliber gun or a .22 caliber gun.

[9] Respondent lodged a copy of Mr. Harrison's analysis of the acoustics evidence from Appendix B of Mel Ayton's book, *The Forgotten Terrorist: Sirhan Sirhan and the Assassination of Robert F. Kennedy* (Potomac Books, 2007).  (*See* Dkt. No. 185 ¶ 24.)  The Court considers "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not."  *Lee*, 653 F.3d at 938 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).

[10] Aside from Ms. Rhodes-Hughes's declaration, eyewitness statements do not identify more than eight shots.  For example, Vincent Di Pierro testified that there were "approximately seven or eight, possibly eight" shots, but he could not say conclusively.  (Dkt. No. 153-2 at 30.)  Before the grand jury, Mr. Uecker testified that he heard possibly six or seven shots altogether.  (Dkt. No. 153-2 at 37–38.)

Respondent faults Mr. Van Praag for making assumptions as to when Petitioner's hand was pinned to the table[11] as well as where the microphone was located.  (Dkt. No. 184 at 2–3.)  The Court need not resolve these discrepancies because it finds that Mr. Van Praag's analysis cannot exonerate Petitioner.

Mr. Van Praag's opinions do not disprove the conclusions of the 1975 Wenke commission regarding the ballistics evidence, (*see infra* Section II.E), the eyewitness testimony that Petitioner was the shooter, (Dkt. No. 180-1, Exs. A–B), the fact that Petitioner fired all eight bullets in his gun, (Dkt. No. 218 at 34), or Petitioner's pretrial and trial admissions and planning activities, *see People v. Sirhan*, 7 Cal. 3d 710, 720, 732 (Cal. 1972).  At most, Petitioner creates a sense of doubt about the number of gunshots fired in the kitchen on June 5, 1968, but contemporaneous eyewitness statements do not support a second shooter theory.[12]  (*See* Dkt. No. 180-1

---

[11] Additionally, eyewitness statements vary in terms of the number of shots that were fired before bystanders began to subdue Petitioner.  According to Jesse Unruh, it could have been four shots, a pause, and then four more shots.  (Dkt. No. 184 at 6; *see* 12 RT at 3273.)  Mr. Burns heard a "string" of shots and saw the Senator "falling and spinning" before Petitioner was grabbed.  (Dkt. No. 184 at 6; *see* 12RT at 3399, 3402.)  William Barry and Rafer Johnson testified that Petitioner fired all his shots before they grabbed him.  (Dkt. No. 184 at 6; *see* 12 RT at 3452, 3474.)  Ms. Urso heard at least three shots before there was chaos and a scuffle between Petitioner and a group of men.  (Dkt. No. 180-1 at 8, 27.)  Mr. Minasian heard two shots before he and Mr. Uecker grabbed Petitioner.  (Dkt. 180-1 at 24–27.)  A third shot was fired two or three seconds after the second shot.  (Dkt. 180-1 at 24–27.)  Mr. Petrusky did not specify the number of shots before Petitioner was grabbed and could not tell the exact number of shots fired thereafter.  (Dkt. 180-1 at 29–30.)  Mr. Uecker testified before the grand jury that he grabbed Petitioner by the third shot and testified at trial that he must have grabbed him by the second or third shot.  (Dkt. No. 180-1 at 33–34.)

[12] In his objections, Petitioner points to a 1992 affidavit from Evan Phillip Freed, (Dkt. No. 153 at 40), and a 1987 interview with Booker Griffin to support the second shooter theory, (Dkt. No. 153 at 40); yet their accounts are not consistent with those of nearly every witness who was in the kitchen pantry.  Contemporaneous statements from eyewitnesses do not support the second shooter theory.  For example, Mr. Romero stated that he saw Petitioner "jumping up" and "reaching over" to the Senator.  (Dkt. No. 180-1 at 11.)  After Senator Kennedy was shot, Mr. Romero tried to help him straighten up, but he "felt something like burning, . . . Powder burns."  (Dkt. No. 180-1 at 11.)  He also stated to police that he saw "a small gun."  (Dkt. No. 180-1 at 11.)  Further, as the Report concludes, Mr. Griffin's statement inculpates Petitioner.  Though Mr. Griffin referred to a second gunman, he identifies "[an]other person, the taller person as the one . . . that had shot Paul Schrade," while Petitioner

at 5–36; *see also* Dkt. No. 153-2 at 29–41.) As the Report discusses, Petitioner himself undermined the second shooter theory at his 1985 parole hearing when he stated, "If anybody else was involved, wouldn't I help myself after all these years, by telling authorities who else was in on it?"[13] (Dkt. No. 216 at 52 n.28.) In light of the overwhelming evidence of guilt, Mr. Van Praag's expert opinion is not sufficient to show actual innocence or to undermine the reliability of evidence so as to make a showing of actual innocence. *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 885 (9th Cir. 2007) (rejecting actual innocence claim in light of overwhelming evidence of guilt). Accordingly, Petitioner's objection is without merit. The Magistrate Judge properly considered the acoustics evidence.

## D. Findings of Fact from the California Supreme Court

Petitioner disputes several of the findings of fact in the Report, arguing that there is insufficient documentation. These facts, however, were adopted from the California Supreme Court's factual summary in *Sirhan*. (*See* Dkt. No. 216 at 18 n.11.) This factual summary is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Here, Petitioner fails to meet his burden.

---

shot Senator Kennedy. Transcript of Interview of Booker Griffin, Exhibits to Request to the Los Angeles County Grand Jury, Section 33 (June 5, 1987), *available at* https://www.maryferrell.org/mffweb/archive/viewer/showDoc.do?docId=99873&relPageId=44.

[13] Petitioner did not oppose the use of his statement or provide context for it in his objections to the Report.

14

First, Petitioner objects to statements regarding his activity with the Rosicrucian Order.  The Report states that "[Petitioner] joined the [Rosicrucian] Order in 1965.  He performed several experiments such as concentrating on a mirror and seeing the face of Robert Kennedy instead of his own."  (Dkt. No. 218 at 25; *accord* Dkt. No. 216 at 26.)  Petitioner argues that while he did look into the mirror following ritual instructions from the Order, this exercise was for the purpose of looking for his own aura.  (Dkt. No. 218 at 25.)  Second, Petitioner objects to the use of a conversation between Petitioner and Jesse Unruh.  (Dkt. No. 218 at 25; *see* Dkt. No. 216 at 21.)  According to Petitioner, these statements lack a verifying source or documentary authority.  Third, Petitioner takes issue with the Report's statement that Petitioner was "in possession of newspaper clippings about Senator Kennedy when he was apprehended in the act of shooting him."  (Dkt. No. 218 at 28; *accord* Dkt. No. 216 at 22.)  Instead, Petitioner argues that he was in possession of a newspaper, which undoubtedly would contain an article about Senator Kennedy.  Petitioner implies that he did not purposefully possess articles about the Senator.  (Dkt. No. 218 at 28.)

Petitioner does not agree with the California Supreme Court's characterization of evidence or its quality of documentation, but he fails to provide evidence, let alone clear and convincing evidence, to rebut the presumption of correctness.  Therefore the Court OVERRULES these objections.

### E.  Ballistics Evidence

Petitioner objects to the Report's treatment of the ballistics evidence; yet Petitioner does not provide evidence to support his theory of bullet substitution.  Petitioner theorizes that the bullets introduced at trial as the Kennedy neck bullet and the Goldstein bullet were substitutes for the actual bullets.  (Dkt. No. 218 at 28.)  Petitioner argues that Officer DeWayne Wolfer lied at trial and at subsequent hearings about matching the bullets to Petitioner's gun, speculating that a substitution of bullets must have taken place.  (Dkt. No. 218 at 31–32.)  But

15

Petitioner does not point to any substantive evidence, new or old, to support these allegations.  Rather, to support his assertions, Petitioner argues:

1. The prosecution had its own analyst DeWayne Wolfer introduce the Kennedy neck bullet (Ex. 47);

2. Conflicted defense counsel stipulated his acceptance of the State's ballistics evidence without conducting any examination of his own; and

3. The Medical Examiner, who actually removed the bullet during his autopsy, incredibly was not asked either by the prosecution or the defense to identify the bullet he removed and marked for identification.

(Dkt. No. 218 at 30–31.)

The issues raised by Petitioner have been rejected previously.  In 1975, a court-appointed panel of experts extensively reviewed the ballistics evidence and heard testimony from witnesses, such as Officer Wolfer.[14]  (Dkt. No. 135 at 46.)  The panel was unable to confirm that three bullets were fired from Petitioner's gun due to "barrel fouling" and a potential loss of fine detail in the intervening years; the commission did find, however, that the bullets were consistent with having been fired from the same gun.  (Dkt. No. 181-1 at 60–61.)  The panel concluded that "[t]here [wa]s no substantive or demonstrable evidence to indicate that more than one gun was used to fire any of the bullets examined."  (Dkt. No. 181-1 at 60.)  Accordingly, the Court does not find merit in Petitioner's objections pertaining to his substitution theory.

---

[14] In 1975, Superior Court Judge Robert A. Wenke appointed a panel of seven experts to review Officer Wolfer's conclusions.  The seven experts included: (1) Stanton O. Berg, Independent Examiner; (2) Alfred A. Biasotti, California Department of Justice Laboratory; (3) Lowell W. Bradford, Forensic Scientist; (4) Cortland Cunningham, FBI Laboratory; (5) Patrick V. Garland, Tidewater Regional Laboratory; (6) Charles V. Morton, Forensic Scientist; and (7) Ralph F. Turner, Forensic Scientist.  (Dkt. No. 135 at 46.)

Petitioner makes another objection to the ballistics evidence, but the relevant portion of the Report was amended.  Therefore, it is unnecessary to examine this objection further.[15]

### F.  Hypnotic Programming

According to Petitioner, the Report blatantly distorts and ignores the opinions of qualified professionals Dr. Daniel Brown and Professor Alan Scheflin.  (Dkt. No. 218 at 35.)  The Court finds that Petitioner misunderstands the actual innocence standard and fails to provide sufficient evidence to pass through the *Schlup* gateway.

### 1.  Actual Innocence Standard

Petitioner states the standard of review that must be applied to this evidence, that "[t]he standard is not to show who did the mind control; the standard is reasonable doubt."  (Dkt. No. 218 at 38.)  The Court does not agree.  In *Schlup*, the Court discussed the incidence of reasonable doubt and determined that it was not sufficient on its own to show actual innocence.

> The meaning of actual innocence as formulated . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.  It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

---

[15]  In another objection, Petitioner faults the Report for misrepresenting evidence; yet Petitioner is quoting an earlier version of the Report that has since been amended.  In an earlier version of the Report, the Magistrate Judge stated that "when [Petitioner] was arrested, Petitioner had two caliber Mini-Mag bullets on his person."  (Dkt. No. 218 at 27; *accord* Dkt. No. 199 at 39.)  The Report now reads that "when he was arrested, [P]etitioner had two .22 caliber bullets on his person."  (Dkt. No. 216 at 40.) As a result, this objection is no longer relevant.

1
2
3
4
5
6
7
8
9
10
11
12

*Schlup*, 513 U.S. at 329.  Petitioner may be referring to *Lee*, in which the Court held that a petitioner need not affirmatively prove innocence where the "post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt."  653 F.3d at 938 (internal quotation marks omitted).  In either case, Petitioner overstates the Report's assessment of the evidence.  The Report only concludes that Petitioner's evidence "may be sufficient to suggest that [P]etitioner's mind-control theory is not impossible."  This statement does not translate to a finding that it is more likely than not that no juror, acting reasonably, could find Petitioner guilty beyond a reasonable doubt.  As such, Petitioner's objection to the applicable standard is without merit.  The Report correctly cites and applies the actual innocence standard.

## 2.  Hypno-Programming Evidence

13
14
15
16

        Having reviewed Petitioner's evidence of mind control and hypno-programming and considered it in conjunction with the other evidence submitted with the habeas petition, the Court agrees that Petitioner has failed to demonstrate actual innocence in accordance with *Schlup*.

17
18
19
20
21
22
23
24
25

        Roughly forty years after the incident, Dr. Brown opines that a third party used a combination of drugs, hypnosis, sensory deprivation, and suggestive influence to exert coercive persuasion over Petitioner, causing him to commit the acts at issue here. (Dkt. No. 207 at 37.)  Petitioner points to a two-week period when he disappeared after falling off of a horse as an opportunity for him to be programmed. (Dkt. No. 218 at 37.)  Additionally, as an avid user of the short-wave radio, Petitioner theorizes that he could have received messages and continued programming once he returned home.[16]  (Dkt. No. 207 at 42.)

26
27
28

---

[16] According to Professor Scheflin, hypnosis via telephone was possible so long as the subject was given the proper conditioning.  (Dkt. No. 180-2 at 22.)  Other experts in the field dispute this.  (*See* Dkt. Nos. 180-2 at 4:23–25, 5:15–16, 22:4–7; 180-3 at 19:25–26; 216 at 61:22–62:2.)

Dr. Brown concludes that Petitioner's susceptibility to hypnotism places him among the 4–5% of people who could be hypnotized to commit antisocial acts.  (Dkt. No. 180-3 at 13.)  According to Dr. Brown, Petitioner is also "highly socially compliant and has a high dissociative coping style.  All three factors predict strong vulnerability to undue suggestive influence or coercive persuasion, hypnotic and non-hypnotic."  (Dkt. No. 180-3 at 13.)  Dr. Brown states in his opinion that he used the term coercive persuasion "because high hypnotizability, in [his] opinion, is only one of a number of factors contributing to the overall coercive persuasion in the Petitioner's case that led to his firing a weapon on the night of the assassination and subsequently led to his becoming amnesic for his actions."  (Dkt. No. 180-3 at 10.)  Dr. Brown does not provide further details or evidence regarding the type of drugs or sensory deprivation used to exert coercive persuasion over Petitioner; instead, he argues that his diagnosis coupled with Petitioner's recollections[17] serve as sufficient evidence of hypnotic programming and coercive persuasion to demonstrate actual innocence.  (Dkt. No. 180-3 at 22.)

Next, Petitioner points to the opinions of Professor Scheflin and Dr. Edward Simson-Kallas to sustain his burden of proving actual innocence.  Professor Scheflin did not examine Petitioner.  Instead, his opinion is offered to rebut Respondent's argument that hypno-programming is a "fantastic" theory.  (Dkt. No. 180-2 at 7.)  Professor Scheflin provides a background on hypnosis theories, concluding that

---

[17] For example,

> Petitioner recalled suggestions given to him by the strange man with the turned down moustache, who told him that government officials needed to be killed.  The Petitioner also specifically recalled being given suggestions by an anonymous party over his short wave set that he wrote down in his spiral notebooks as suggested while in an hypnotic state and while engaging in an automatic writing.

(Dkt. No. 180-3 at 24.)  Dr. Brown also concludes, "Petitioner was generally amnesic for writing passages in his spiral notebooks, but handwriting analysis has generally supported that the writings were made by his hand."  (Dkt. No. 180-3 at 24.)

research shows "it is possible, with a small select group of individuals, to influence the mind and behavior beyond legally and ethically permissible limits."  (Dkt. No. 180-2 at 30.)  Professor Scheflin "personally knew several of the leading researchers who participated in [hypnosis] programs" conducted by government agencies.  (Dkt. No. 180-2 at 2.)  Professor Scheflin concludes that "[t]he idea of a hypnotically programmed agent may be 'fantastic,' as the Respondents claim, but it is not untrue." (Dkt. No. 180-2 at 30.)  While Professor Scheflin has an extensive background on the subject, he offers little direct application of his research to Petitioner's case.  The only part of Professor Scheflin's opinion that pertains directly to Petitioner is derived from the opinions of Dr. Simson-Kallas, a psychologist who had the opportunity to spend considerable time with Petitioner.  (Dkt. No. 180-2 at 28.)

Professor Scheflin reviews Dr. Simson-Kallas's 1975 statement to the *San Francisco Examiner* that Petitioner was "a perfect choice for being a programmed hypnotic patsy."  (Dkt. No. 180-2 at 28.)  Professor Scheflin also recounts Dr. Simson-Kallas's critique of the theories presented on behalf of Petitioner at trial by defense expert Dr. Bernard Diamond.  (Dkt. No. 180-2 at 29.)  Dr. Simson-Kallas dismissed Dr. Diamond's trial diagnosis that Petitioner was a paranoid schizophrenic who hypnotized himself into committing the acts.  (Dkt. No. 180-2 at 29.)  Rather, Dr. Simson-Kallas opined that Petitioner "was put up to draw attention while experts did the work.  He would be easily blamed, being an Arab.  He was programmed to be there."  (Dkt. No. 180-2 at 29.)  Dr. Simson-Kallas reasoned that Petitioner "liked Kennedy, [and] that he held no animosity towards him."[18]  (Dkt. No. 180-2 at 29.) Petitioner argues that Dr. Simson-Kallas's opinions should not be dismissed because they were in fact formed "in a time frame that was 'contemporaneous' with the crime

---

[18] Dr. Simson-Kallas told Professor Scheflin that he was curious about Petitioner because he was "unable to remember details of the crime, unlike most killers he interviewed," and his description of the events appeared artificial, as if he were "'reciting from a book.'"  (Dkt. No. 180-2 at 29.)

and found no medical evidence that [P]etitioner was schizophrenic."  (Dkt. No. 218 at 39.)

Finally, Petitioner offers evidence of "two more recent, sensational studies." (Dkt. No. 218 at 44.)  The Court finds that Petitioner did not exercise due diligence in discovering and briefing these studies.[19]  Accordingly, the Court has exercised its discretion to disregard this untimely evidence.  *See Howell*, 231 F.3d at 623 (holding that the district court did not abuse its discretion when it disregarded supplemental evidence because the petitioner did not present facts to the magistrate judge or adequately explain the deficiency).

The Court is not persuaded by Petitioner's evidence.  Petitioner focuses on invalidating Dr. Diamond's opinion, rather than confronting other contemporaneous opinions and statements that undermine Dr. Simson-Kallas and Dr. Brown's findings.  For example, on cross-examination, Petitioner admitted to stating "I killed Robert Kennedy willfully, premeditatively, with twenty years of malice aforethought."  *Sirhan*, 7 Cal. 3d at 720.  This admission flatly contradicts Dr. Simson-Kallas's finding that Petitioner liked Senator Kennedy.  Further, Petitioner fails to contradict the trial testimony of Dr. Seymour Pollack, who testified on behalf of the prosecution.  After spending roughly 200 hours on the case, Dr. Pollack agreed with Dr. Simson-Kallas and Dr. Brown, finding that Petitioner is not a paranoid schizophrenic.[20]  Yet Dr. Pollack did not agree with their other findings, testifying

---

[19] Petitioner only briefed these studies for the Magistrate Judge in his objections to the Report and Recommendation.  (Dkt. No. 207 at 44.)  One study aired in October 2011, and the other aired in October 2012.  (Dkt. No. 218 at 44–45.)  Petitioner's objections to the Magistrate Judge's Report and Recommendation were filed on April 3, 2013.  (*See* Dkt. No. 207.)  Petitioner does not explain the untimely introduction of this evidence.  Accordingly, the Court concludes that Petitioner failed to exercise due diligence.

[20] The California Supreme Court relied on the trial opinion of Dr. Pollack when considering whether there was substantial proof before the jury to show that Petitioner had the capacity to form intent.  Dr. Pollack "examined [the Petitioner] on eight occasions."  *Sirhan*, 7 Cal. 3d at 728.  He also "reviewed extensive materials and interviewed members of defendant's family, [and] testified that although

21

that he "found no evidence of any altered state of consciousness or dissociate state, and various matters indicated to the contrary." [21] *Sirhan*, 7 Cal. 3d at 725. Finally, neither Dr. Brown nor Petitioner addresses evidence from defense investigator Michael McCowan suggesting that Petitioner was not in an amnesiac state.[22] Petitioner's evidence is far from conclusive on the issues of hypno-programming and coercive persuasion.

As discussed in *Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003), psychiatrists and psychologists often disagree on patient assessments, particularly with diagnoses of mental illness. As a result, the court in *Griffin* concluded that

---

defendant was mentally ill, defendant did not have diminished capacity to harbor malice aforethought or to maturely and meaningfully reflect upon the gravity of his contemplated act." *Id.*

[21] Dr. Pollack noted that the

> testimony of eyewitnesses showed defendant was aware of the significance of questions asked him and the tape recordings of his conversations at the police station indicated "a great deal of reasoning ability." There was no substantial impairment of his attention (i.e., ability to attend to his environment in a meaningful manner), perception (i.e., ability to perceive objects in a meaningful manner, using past experiences), understanding (i.e., ability not simply to know but to appreciate "in a fuller sense"), ability to associate ideas logically, and freedom of choice. His emotions were "not that disturbed." He was becoming more irritable and explosive but there was no substantial evidence that "this was an impulsive explosion." His foresight (i.e., his ability to look forward and plan) appeared to be reasonably intact, and the same was true regarding his memory.

*Id.* at 725.

[22] Petitioner provided Defense Investigator Michael McCowan with very detailed handwritten notes about the events. For example, Petitioner wrote about his visit to the shooting range, in which he identifies witnesses who later appeared before the grand jury. (Dkt. No. 162-5.) Petitioner also drew the layout of the Ambassador Hotel and wrote notes identifying individuals with whom he spoke or whom he saw prior to the shooting. (Dkt. Nos. 162, 162-4, 162-6.) Further, in a conversation with the investigator, Petitioner stated he made eye contact with Senator Kennedy. When asked why Petitioner did not shoot Senator Kennedy "between the eyes," Petitioner responded "[b]ecause that son of a bitch turned his head at the last second." (Dkt. No. 174 at 15; *accord* Dkt. No. 185 ¶ 25.)

evaluations from psychologists should be given little weight on habeas review because "'a defendant could . . . always provide a showing of actual innocence by hiring psychiatric experts who would reach a favorable conclusion.'" *Id.* (alteration in original) (internal quotation marks and citation omitted) (quoting *Harris v. Vasquez*, 949 F.2d 1497, 1515 (9th Cir. 1990)).  Petitioner's "mere presentation of new psychological evaluations . . . does not constitute a colorable showing of actual innocence." *Id.* (alteration in original).

Petitioner attempts to distinguish *Griffin* from the facts of this case because "in *Griffin*, no psychological evidence was offered or relied upon by the defense team, whereas in the present case petitioner's defense team centered their whole case on petitioner's mental state and then at Trial, lead Counsel, Grant Cooper misrepresented, distorted, and omitted said evidence." (Dkt. No. 218 at 40.)  The Court does not find this distinction significant and accordingly finds the holding of *Griffin* to be binding precedent.

Under *Schlup*, the Court must "make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup*, 513 U.S. at 328 (internal quotation marks omitted).  As such, the Court has assessed Petitioner's claim of actual innocence in light of all of the evidence, as was done in *Griffin*.  Viewed in a light most favorably to him, Petitioner shows that mind control may not be impossible, and that he possesses personality traits suggesting that he would be an able candidate for such mind control.  This does not meet the showing required by *Schlup* to pass through the actual-innocence gateway.

In light of this and the other evidence, Petitioner does not establish "that it is more likely than not that no reasonable juror would have convicted him in the light

of the new evidence." *Schlup*, 513 U.S. at 327.  As such, Petitioner is misled when he argues that he has met his evidentiary burden.  His objections are without merit.

## V. REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing to assess the new eyewitness, acoustics, ballistics, and hypno-programming evidence.  Pursuant to 28 U.S.C. § 2254(e)(2), federal courts may only hold evidentiary hearings on habeas claims under certain prescribed conditions:

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, *the court shall not hold an evidentiary hearing* on the claim *unless the applicant can show that—*
>
> (A) the claim relies on—
> (i)  a new rule of constitutional law . . . ; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* (emphasis added); *accord Griffin*, 350 F.3d at 965–66 (quoting 28 U.S.C. § 2254(e)(2)) (finding that the circumstances did not warrant an evidentiary hearing because Petitioner did not show that no reasonable factfinder would have found the applicant guilty of the underlying offense).

The acoustics evidence and new eyewitness statements do not meet the threshold for an evidentiary hearing.  Even assuming that Petitioner exercised due diligence as discussed in Section II.C, Mr. Van Praag's expert opinion does not exonerate Petitioner.  It raises doubts as to the number of bullets fired, but it does nothing to diminish the overwhelming evidence of guilt.  Similarly, as discussed in Section II.B, while Ms. Rhodes-Hughes's recent declaration suggests the presence of a second shooter, it also unequivocally confirms Petitioner's role as a shooter in the kitchen pantry.  It is contradicted by the other eyewitness testimony.  Petitioner does

24

not prove by clear and convincing evidence that, but for ineffective assistance of counsel, no reasonable factfinder would have found Petitioner guilty of the underlying offense.

Additionally, the conditions required for an evidentiary hearing are not met for the ballistics evidence.  This evidence has already been considered by courts, as well as by a commission of experts.  The commission was precluded from making a conclusive determination in 1975 because of "barrel fouling," "impact damage and distortion," and a "possible loss of fine detail over the intervening years."  (Dkt. No. 181-1 at 60–61.)  Petitioner does not indicate how a renewed study of the evidence will overcome these same challenges.  Further, in 1975, the commission did not make a recommendation for additional testing of the physical evidence.  (Dkt. No. 181-1 at 62.)  Petitioner thus "has not established that an evidentiary hearing would produce evidence more reliable or more probative" than the evidence currently before the Court.  *Griffin*, 350 F.3d at 966.

Finally, the expert opinions of Dr. Brown and Professor Scheflin are insufficient to support Petitioner's request for an evidentiary hearing on the topic of hypno-programming.  Though Petitioner raises doubts as to the assessment conducted by Dr. Diamond, there is a conflicting opinion from Dr. Pollack and inculpatory evidence from Mr. McCowan.  Petitioner fails to provide clear and convincing evidence that, but for ineffective assistance of counsel, no reasonable factfinder would have found Petitioner guilty of the underlying offense.

Here, Petitioner "has failed to show what . . . an evidentiary hearing might reveal of material import on his assertion of actual innocence."  *Id.* (alteration in original) (internal quotation marks and citation omitted).  Accordingly, the Court declines Petitioner's request for an evidentiary hearing.

## VI.  CONCLUSION

IT IS ORDERED that: (1) the August 26, 2013 Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as to the

findings of fact and conclusions of law herein; (3) Petitioner's request for an evidentiary hearing is DENIED; and (4) Judgment shall be entered DENYING the petition for writ of habeas corpus and DISMISSING the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on the parties.

**IT IS SO ORDERED.**

Dated:  January 5, 2015

_____
HONORABLE BEVERLY REID O'CONNELL
UNITED STATES DISTRICT COURT JUDGE