1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **WESTERN DIVISION**

11

12  **SIRHAN BISHARA SIRHAN,**          )    **Case No. CV 00-5686-BRO(AJW)**
                                        )
13              **Petitioner,**          )
                                        )
14      **v.**                           )    **REPORT AND RECOMMENDATION**
                                        )    **OF MAGISTRATE JUDGE**
15  **P.D. BRAZELTON, Warden,**[1]       )
                                        )
16              **Respondent.**          )
    _____ )

17

18        This case may be the final chapter in an American tragedy.  On

19  June 5, 1968, moments after declaring victory in the California

20  Democratic primary, Senator Robert F. Kennedy walked through the

21  kitchen pantry of the Ambassador Hotel, where petitioner was waiting.

22  As Senator Kennedy stopped to shake hands with hotel employees,

23  petitioner walked toward him, extending his arm.  Instead of shaking

24  Senator Kennedy's hand, petitioner shot him.  Petitioner continued to

25  fire his gun even as bystanders wrestled him onto a table.  Senator

26  _____

27       [1]  The Clerk is directed to substitute P.D. Brazelton, the current
    warden of the prison where petitioner is incarcerated, as the
28  respondent in this case.  See Fed.R.Civ.P. 25(d).

Kennedy died of his wounds.

Petitioner was charged with assassinating Senator Kennedy. The evidence of petitioner's guilt was overwhelming. Not only did numerous witnesses see petitioner shoot Senator Kennedy, but petitioner – who had written "RFK Must Die" and "Robert F. Kennedy must be assassinated" repeatedly in his diary – confessed to shooting Senator Kennedy "with malice aforethought." Petitioner was convicted of first degree murder and five counts of assault with a deadly weapon. He received a death sentence.

In this petition for a writ of habeas corpus, petitioner challenges his conviction for the assassination of Senator Kennedy. This petition was filed in 2000 – more than three decades after petitioner was convicted.[2] Not surprisingly, respondent moved to dismiss the petition on the ground that it is barred by the statute of limitation. Petitioner opposes the motion, arguing, among other things, that he is entitled to an exception to the statute of limitation because he is actually innocent. For the following reasons, respondent's motion should be granted, and the petition should be dismissed as untimely.

**Procedural Background**

The California Supreme Court affirmed petitioner's conviction, but reduced his sentence to life imprisonment. People v. Sirhan, 7 Cal.3d 710, 717, 755 (1972). The United States Supreme Court denied

---

[2] The petition alleges that (1) the prosecution withheld exculpatory evidence, destroyed evidence, and presented false evidence; (2) the evidence is insufficient to support petitioner's conviction; and (3) petitioner's trial counsel provided ineffective assistance. [See Petition at 1-5, 9-181].

2

petitioner's petition for a writ of certiorari on February 20, 1973. Sirhan v. California, 410 U.S. 947 (1973).

Petitioner filed his first habeas petition in the California Supreme Court in 1975, claiming, among other things, that the prosecution had suppressed evidence suggesting that an unknown second gunman fired the bullet that killed Senator Kennedy. The petition was denied on February 13, 1975. [Lodged Documents ("LD") 13-15].

Later the same year, the Los Angeles Superior Court conducted "special proceedings," pursuant to which a panel of seven independent firearms experts re-examined the ballistics evidence presented at trial. [LD 6 (Exhibits to Petition in Case No. S062258), Exhibit ("Ex.") A (February 5, 1976 Minute Order) & Ex. G (Superior Court's Order for Resting of Exhibits); LD 27 (Partial Reporter's Transcript of Proceedings)]. The examiners reviewed the evidence, conducted tests, and unanimously concluded that there was no indication that the bullets were fired from different guns. The examiners, however, were unable to definitively confirm that the bullets (including the bullet removed from Senator Kennedy's neck) were fired from petitioner's gun. The inability to confirm that petitioner's gun fired the bullets was the result of the physical condition of the gun (which, in turn, was the partly the result of the passage of time), which prevented reproducibility. [LD 6, Ex. B (Comprehensive Joint Report of the Firearms Examiners)].

On April 21, 1997, petitioner filed a habeas petition in the Los Angeles County Superior Court.[3] On April 30, 1997, the Superior Court

___

[3] A copy of this petition has not been made available to the Court. [See Docket No. ("DN") 179 (Response and Declaration of Jaime

1   denied the petition on the merits, noting that petitioner had offered

2   to plead guilty to first degree murder in exchange for a sentence of

3   life in prison, and that at trial, petitioner had admitted shooting

4   Senator Kennedy. [LD 9].

5      On May 1, 1997, petitioner filed a habeas petition in the

6   California Court of Appeal. [LD 2]. The petition was denied on June

7   17, 1997. The appellate court found that the petition was untimely,

8   that petitioner was estopped from claiming that someone else killed

9   Senator Kennedy after testifying at trial that he did, that there was

10   no violation of petitioner's constitutional rights, and that there was

11   no basis for doubting the correctness of the verdict. [LD 3].

12      Petitioner filed a habeas petition in the California Supreme

13   Court on June 20, 1997. [LD 4]. Respondent was ordered to file an

14   informal response to the petition, and was granted five extensions of

15   time within which to do so. The petition was denied on May 24, 2000,

16   both as untimely and on the merits. [LD 7].

17      This petition was filed the next day.[4]

18                    **Discussion**

19      Section 2244(d) imposes a one-year deadline on the filing of a

20

21 _____

22   L. Fuster]. Nevertheless, there is no dispute as to the date on which
  it was filed. [See LD 9 (the Superior Court's order denying the

23   petition, stating that the petition was filed April 21, 1997); DN 106
  (Motion to Dismiss) at 2; DN 135 (Opposition to Motion to Dismiss) at

24   5].

25      [4]    Because petitioner was represented by counsel at the time he
  filed this and all relevant state petitions, the "mailbox rule" does

26   not apply. See Houston v. Lack, 487 U.S. 266, 275-276 (1988) (holding
  that a pro se prisoner's pleading is deemed filed at the moment it is

27   delivered to prison authorities for mailing).

28                           4

habeas corpus petition by a state prisoner.   28 U.S.C. § 2244(d).[5]
Where, as here, a conviction became final before the enactment of the
AEDPA, a petitioner has until April 24, 1997 within which to file a
federal petition.   See Patterson v. Stewart, 251 F.3d 1243, 1245-1246
(9th Cir.), cert. denied, 534 U.S. 978 (2001); Miles v. Prunty, 187
F.3d 1104, 1105 (9th Cir. 1999); Calderon v. United States District
Court (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522
U.S. 1099 & 523 U.S. 1061 (1998), overruled on other grounds by
Calderon v. United States District Court (Kelly), 163 F.3d 530 (9th
Cir. 1998)(en banc), cert. denied, 526 U.S. 1060 (1999).

    This petition, however, was not filed until May 25, 2000, more
than three years after the limitation period expired.   Absent grounds

---

[5]    It provides:

A 1-year period of limitation shall apply to an application
for a writ of habeas corpus by a person in custody pursuant
to the judgment of a State court.   The limitation period
shall run from the latest of --
        (A) the date on which the judgment became final by the
        conclusion of direct review or the expiration of the
        time for seeking such review;
        (B) the date on which the impediment to filing an
        application created by State action in violation of the
        Constitution or laws of the United States is removed,
        if the applicant was prevented from filing by such
        State action;
        (C) the date on which the constitutional right asserted
        was initially recognized by the Supreme Court, if the
        right has been newly recognized by the Supreme Court
        and made retroactively applicable to cases on
        collateral review; or
        (D) the date on which the factual predicate of the
        claim or claims presented could have been discovered
        through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

for statutory or equitable tolling, delayed accrual, or some other exception to the statute of limitation, this petition is time-barred.

**A. Statutory tolling**

The limitation period does not run while a properly filed state application for post-conviction relief is pending. 28 U.S.C. § 2244(d)(2); see Carey v. Saffold, 536 U.S. 214, 218 (2002).

Petitioner filed a petition in the Los Angeles County Superior Court on April 21, 1997, with four days of the limitation period remaining. That petition was denied on April 30, 1997. Thus, petitioner had until May 5, 1997 to file his federal petition.[6]

As set forth above, petitioner also filed habeas petitions in the California Court of Appeal and the California Supreme Court. Both of those petitions, however, were denied in part as untimely. [LD 3 at 2-5 & LD 7].

When the California courts deny a petition as untimely, the petition is not "properly filed" for purposes of statutory tolling. Allen v. Siebert, 552 U.S. 3, 6-7 (2007); Carey, 536 U.S. at 236; Lakey v. Hickman, 633 F.3d 782, 785-786 (9th Cir.), cert. denied, 131 S.Ct. 3039 (2011). This is true even when the state court's denial is based both on the merits and on the ground of untimeliness. Bonner v. Carey, 425 F.3d 1145, 1148-1149 (9th Cir. 2005), cert. denied, 549 U.S. 856 (2006). Accordingly, the limitation period was not statutorily tolled during the pendency of the petitions filed in the California Court of Appeal or California Supreme Court.

---

[6] The limitation period would have expired on May 4, 1997, but that date was a Sunday, so petitioner had until the following day to file his petition. See Fed.R.Civ.P. 6(a)(1)(C).

6

Petitioner argues that the timeliness requirements are not, or were not at the time the state court imposed them, adequate and independent state procedural rules, and as a result, they are insufficient to prevent statutory tolling. [DN 135 (Opposition to Motion to Dismiss) at 6-20]. The principles of procedural default upon which petitioner relies, however, do not apply to statutory tolling. See Zepeda v. Walker, 581 F.3d 1013, 1018 (9th Cir. 2009) (rejecting the argument that statutory tolling is available where a state procedural rule is not firmly established and regularly followed); Ellis v. Harrison, 2010 WL 3385206, at *18 (C.D.Cal. July 12, 2010)(stating that the petitioner's argument that California's timeliness rule was not applied consistently "appears to confuse procedural default concepts with the analysis required for purposes of the statute of limitations defense"), report and recommendation adopted, 2010 WL 3385201 (C.D.Cal. Aug. 25, 2010); Barr v. Yates, 2009 WL 1468721, at *2 (N.D.Cal. May 26, 2009) (explaining that an argument that a state timeliness rule had been applied inconsistently is "irrelevant" to the statute of limitation issue).[7]

---

[7]     Furthermore, petitioner cannot claim to have relied on precedent holding that an untimely state habeas petition is "properly filed" for purposes of tolling the limitation period. Although the Ninth Circuit so held in Dictado v. Ducharme, 244 F.3d 724, 727-728 (9th Cir. 2001), abrogated by Pace v. DiGuglielmo, 544 U.S. 408 (2005), Dictado was not decided until years after petitioner filed his state petitions (and also after he filed this federal petition). Thus, he is not entitled to equitable tolling based upon a misplaced reliance on then-binding federal law. Cf. Nedds v. Calderon, 678 F.3d 777, 781-782 (9th Cir. 2012) (explaining that a petitioner who relies upon then-binding circuit precedent in making a tactical decision to delay filing a federal petition is entitled to equitable tolling); Harris v. Carter, 515 F.3d 1051, 1055-1056 (9th Cir.) (holding that a petitioner's reliance on Dictado justified equitable tolling), cert. denied, 555 U.S. 967 (2008).

1    As a result, unless petitioner is entitled to equitable tolling
2    or delayed accrual under 28 U.S.C. §2244(d)(1)(D), the limitation
3    period expired on May 5, 1997.

4    **B. Equitable tolling**

5    The limitation period also can be equitably tolled. Petitioner
6    is entitled to equitable tolling only if he shows "(1) that he has
7    been pursuing his rights diligently, and (2) that some extraordinary
8    circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408,
9    418 (2005)). "In this circuit, equitable tolling of the filing
10   deadline for a habeas petition is available 'only if extraordinary
11   circumstances beyond a prisoner's control make it impossible to file
12   a petition on time.'" Lott v. Mueller, 304 F.3d 918, 922 (9th Cir.
13   2002) (quoting Miles, 187 F.3d at 1107). Equitable tolling may be
14   appropriate when "external forces, rather than a petitioner's lack of
15   diligence, account for the failure to file a timely claim." Lott, 304
16   F.3d at 922 (quoting Miles, 187 F.3d at 1107).

17   Petitioner alleges that he is entitled to equitable tolling
18   because he was diligently pursuing his claims through the state
19   courts.  [DN 153 (Petitioner's Supplemental Brief on Equitable
20   Tolling) at 4]. Although petitioner may have been diligent, at least
21   in filing and prosecuting his state habeas petitions, diligence alone
22   is not enough to warrant equitable tolling. Petitioner also must show
23   that an extraordinary circumstance prevented him from filing his
24   federal petition within the statutory deadline.

25   While unfortunate, petitioner's predicament is not a result of
26   circumstances beyond his control.  No external force was the proximate
27   cause of petitioner's untimely filing of this petition.  Instead,

28

petitioner's plight is a result of his (and his counsel's) choice to wait for the outcome of each of his three state habeas petitions before filing a petition in this Court, rather than to file a federal petition and seek a stay so that he could exhaust his state remedies as to any unexhausted claims.  See Pace, 544 U.S. at 416 (addressing the predicament of a petitioner who litigates in state court, only to discover that his state petition was not "properly filed" and thus that his federal petition is untimely, and explaining that a petitioner can avoid this predicament by filing a "protective" petition in federal court and asking that court to stay the proceedings until state remedies are exhausted); Rhines v. Weber, 544 U.S. 269, 273-275 (2005) (holding that federal courts may stay mixed petitions while a petitioner exhausts his state remedies).  Petitioner took the risk that the statute would be interpreted (as it subsequently has been) as excluding statutory tolling for state petitions denied as untimely.

Although petitioner's counsel made an unsound tactical decision – namely, to pursue additional collateral proceedings in state court in 1997 before filing a federal petition – this simple tactical error did not amount to the type of egregious or extraordinary misconduct sufficient to warrant equitable tolling.  See Holland v. Florida, 130 S.Ct. 2549, 2564 (2010) (stating that "garden variety" claims of attorney negligence such as miscalculating the limitation period or being unaware that the period had expired do not warrant equitable tolling, but that extraordinary misconduct – such as ignoring the petitioner's repeated letters and failing to communicate for years despite pleas from the petitioner – might warrant equitable tolling);

1   See <u>Randle v. Crawford</u>, 604 F.3d 1047, 1058 (9th Cir.) (finding that
2   equitable tolling was not warranted where the petitioner's counsel
3   failed to perfect a timely appeal, failed to inform the petitioner of
4   the deadline for filing a state habeas petition, and failed to provide
5   the petitioner with his case files in a timely manner because attorney
6   negligence did not amount to "extraordinary circumstances" and did not
7   prevent the petitioner from timely filing a federal petition), <u>cert.</u>
8   <u>denied</u>, 131 S.Ct. 474 (2010); <u>Waldron-Ramsey v. Pacholke</u>, 556 F.3d
9   1008, 1011 (9th Cir.) ("To apply the doctrine in extraordinary
10  circumstances necessarily suggests the doctrine's rarity, and the
11  requirement that extraordinary circumstances stood in his way suggests
12  that an external force must cause the untimeliness, rather than ...
13  merely oversight, miscalculation or negligence on the petitioner's
14  part....") (internal quotation marks and brackets omitted), <u>cert.</u>
15  <u>denied</u>, 558 U.S. 897 (2009); <u>Frye v. Hickman</u>, 273 F.3d 1144, 1146 (9th
16  Cir. 2001) (holding that equitable tolling was not warranted where the
17  petitioner's retained attorney negligently failed to file a habeas
18  petition within the limitation period), <u>cert. denied</u>, 535 U.S. 1055
19  (2002); <u>but see</u> <u>Spitsyn v. Moore</u>, 345 F.3d 796, 801 (9th Cir. 2003)
20  (holding that equitable tolling was warranted where the petitioner's
21  attorney failed to prepare and file a petition even though he was
22  hired a year in advance of the deadline and the petitioner and his
23  mother contacted the attorney "numerous times, by telephone and in
24  writing, seeking action, but these efforts proved fruitless.
25  Furthermore, despite a request that he return [the petitioner's] file,
26  [the attorney] retained it for the duration of the limitations period
27  and more than two months beyond.").

28

**C. "Delayed accrual" pursuant to 28 U.S.C. §2244(d)(1)(D)**

Petitioner's allegations regarding the belated discovery of exculpatory evidence raise the possibility that the limitation period did not begin to run until the date on which petitioner knew or should have known the factual basis for his claims.   See 28 U.S.C. § 2244(d)(1)(D) (explaining that the limitation period does not begin until the "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence").   As the Ninth Circuit has explained, under section 2244(d)(1)(D), the limitation period does not begin until the petitioner knows, or through diligence could discover, the important facts underlying his claim, not when petitioner recognizes the legal significance of those facts.   Hasan v. Galaza, 254 F.3d 1150, 1154 & n.3 (9th Cir. 2001) (citing Owens v. Boyd, 235 F.3d 356, 359 (7th Cir. 2000) ("Time begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance."); see generally Mardesich v. Cate, 668 F.3d 1164, 1170-1171 (9th Cir. 2012) (stating that section 2244(d)(1) requires consideration of the appropriate triggering date for each claim).   Furthermore, petitioner must demonstrate the he acted diligently in pursuing discovery of the relevant facts.   See Johnson v. United States, 544 U.S. 295, 310 (2005) (holding that a petitioner challenging a federal sentence that was enhanced by a prior conviction that was subsequently vacated was not entitled to delayed accrual because he had failed to exercise due diligence in seeking to overturn the prior conviction).

\\

11

1       **1. The Pruszynksi recording**

2       A reporter named Stanislaw Pruszynski, who was at the Ambassador

3  Hotel on the night Senator Kennedy was shot, inadvertently left his

4  tape recorder on and recorded the shooting.  Petitioner alleges that

5  Pruszynksi's recording is a "key piece" of evidence that "demonstrates

6  that thirteen shots were fired on the night Senator Kennedy was

7  killed." [DN 153 at 4-5].  According to petitioner, the recording was

8  suppressed by government authorities, was not discovered by petitioner

9  until 2001, and was not analyzed by petitioner until 2005 because the

10  technology required to perform the analysis was not available until

11  then.  [DN 153 at 5-6].

12      Contrary to petitioner's contention, this audio recording was

13  available and could have been discovered in 1988, when nearly all law

14  enforcement records regarding Senator Kennedy's assassination were

15  released to the public as part of the California State Archives. [See

16  www.sos.ca.gov/archives (Appendix E, Index and Summary of Audio Tapes

17  listing Pruszynski recording as CSA-K123; Petition at 200 (declaration

18  of petitioner's investigator, Rose Lynn Mangan, stating that

19  petitioner's counsel told her in 1993 that the police evidence in

20  petitioner's case had been released to the public in 1988)].

21      Furthermore, even assuming the truth of petitioner's allegation

22  that he could not have discovered the recording by diligent effort

23  until 2001, petitioner did not need the recording to prepare and file

24  his state or federal petitions.  To the contrary, petitioner filed

25  this petition in 2000, a year before he says he discovered the

26  Pruszynski recording, and five years before the recording allegedly

27  was analyzed with the newly available technology supposedly required

28                                  12

to properly evaluate it.  Because petitioner was able to file this petition without the Pruszynski recording, it could not have been a necessary factual predicate to any claim contained in either his state or federal petitions.  See Jurado v. Burt, 337 F.3d 638, 644 (6th Cir. 2003) ("AEDPA does not convey a right to an extended delay while a habeas petitioner gathers every possible scrap of evidence that might support his claim."); Powelson v. Sullivan, 2006 WL 2263908, at *3-4 (N.D.Cal. Aug. 8, 2006) (concluding that where the petitioner was present at his 1998 sentencing hearing he was not entitled to delayed accrual of a claim challenging his sentence, even though the petitioner allegedly did not obtain physical evidence supporting his claim until 2005).

**2.  The factual predicate for petitioner's Brady and ineffective assistance of counsel claims**

Petitioner alleges that the prosecution suppressed evidence of a bullet fragment removed from Senator Kennedy's head during the autopsy and preoperative police photographs of external wounds; substituted a "fake" bullet for one of the actual bullets; conspired with the Los Angeles Police Department ("LAPD") to alter the forensic evidence; suppressed evidence that the gun matched to the bullets at trial was not his, based upon a discrepancy between the serial number listed on the evidence envelope and the serial number on petitioner's gun; delayed disclosure of the autopsy report; and suppressed evidence of two bullet holes in a door frame at the murder scene, which petitioner alleges to be proof of a second gunman because all eight bullets from petitioner's gun were otherwise accounted for. [Petition at 9-25, 25-49, 49-56, 56-104, 107-132].

13

1      Delayed accrual is not appropriate on these claims because all of

2  the evidence petitioner relies upon was known to petitioner long

3  before the limitation period expired.

4      Most of the evidence petitioner cites as the basis for his claims

5  was known at the time of trial. For example, petitioner relies

6  heavily on Thomas Noguchi's 1968 autopsy report [see Petition at 9-16,

7  25-30, 113-118], but as petitioner concedes, that report was provided

8  to him during the trial. [See Petition at 114; DN 180 (Petitioner's

9  Reply Brief on Actual Innocence) at 49; DN 153, Ex. E (Declaration of

10  Robert Kaiser)]. At the very latest, petitioner possessed the 1968

11  autopsy report in 1975 because it was attached as an exhibit to the

12  habeas petition filed in the California Supreme Court. [LD 13, Ex. B

13  (autopsy report)]. Petitioner also relies on the testimony of DeWayne

14  Wolfer during the special proceedings. Petitioner obviously knew

15  about this testimony at the time it was offered in 1975 because

16  petitioner and his counsel initiated the reinvestigation and

17  petitioner's counsel was present during the testimony. [See LD 27; LD

18  6, Ex. B]. Further, the 1969 Special Unit Senator Report ("SUS")[8] upon

19  which petitioner relies [see Petition at 37-38, 60] was readily

20  available in 1988, when it was released to the public. [LD 6, Exs. C

21  (John Kendall, "State Releases Records From R.F.K. Slaying," Los

22  Angeles Times, April 20, 1988) & J (LAPD Final Report, Special Unit

23  Senator)]. To the extent that petitioner's claims are based on

24  testimony from his trial or alleged irregularities in exhibits

25

26      [8]  Special Unit Senator was a task force set up by the Los
Angeles Police Department to investigate the shooting of Senator

27  Kennedy. [See LD 27 at 26; LD 6, Ex. J].

28                         14

presented at his trial [see Petition at 9-25], petitioner obviously knew about these "facts" at the time the testimony was given or the exhibits were offered, in 1969.  His reliance on evidence of bullet holes in the door jamb near the crime scene [see Petition at 123-128] is similarly unavailing because he attached a photograph of the door frame bullet holes as an exhibit to his 1975 habeas petition filed in the California Supreme Court.  [LD 13, Ex. E (photograph)].  Thus, petitioner knew, or reasonably could have known, all of the facts he says he needed to pursue his claims as early as 1968, or at the latest, 1988.

It is worth noting that all of the facts upon which petitioner's claims are predicted are the very same facts presented in his state habeas petition. [See Petition at 9, n.1 (explaining that citations to exhibits are references to exhibits presented in support of petitioner's habeas petition filed in the California Supreme Court on June 20, 1997)].  Because petitioner knew of the factual basis for his claims in time to file his state habeas petition on April 21, 1997, he necessarily knew those facts in time to file a timely federal petition before April 24, 1997.

The same analysis applies to petitioner's claims of ineffective assistance of counsel.  The critical facts relevant to petitioner's claims were known, or could have been known, in 1988 when the state archives were made public.  At the latest, the predicate facts were known by April 21, 1997, when petitioner filed his state habeas petition raising the same claims based upon the same evidence (other than the Pruszynski recording) as presented in this federal petition. [See LD 4 at 5].  Thus, petitioner actually knew or had access to the

1  necessary facts in time to present his claims to federal court before

2  the limitation period expired.

3  **D. Actual innocence**

4  Petitioner contends that the statute of limitation does not bar

5  consideration of his petition because he is actually innocent. [DN 153

6  at 18-57; DN 180 at 7-36].

7  The Supreme Court recently held that a credible showing of actual

8  innocence constitutes an exception to the bar of the statute of

9  limitation. McQuiggin v. Perkins, 133 S.Ct. 1924, 1933-1934 (2013).

10 This exception, however, applies to a "severely confined category" of

11 cases – those in which a petitioner can demonstrate "that it is more

12 likely than not that no reasonable juror would have convicted him in

13 the light of the new evidence." Perkins, 133 S.Ct. at 1933 & 1935

14 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)); see also Lee v.

15 Lampert, 653 F.3d 929, 937 (9th Cir. 2011) (en banc) ("where an

16 otherwise time-barred habeas petitioner demonstrates that it is more

17 likely than not that no reasonable juror would have found him guilty

18 beyond a reasonable doubt, the petitioner may pass through the Schlup

19 gateway and have his constitutional claims heard on the merits"). In

20 order to fit within the exception, a petitioner is required "to

21 support his allegations of constitutional error with new reliable

22 evidence — whether it be exculpatory scientific evidence, trustworthy

23 eyewitness accounts, or critical physical evidence — that was not

24 presented at trial." Schlup, 513 U.S. at 324; see Majoy v. Roe, 296

25

26

27

28                                   16

F.3d 770, 776 (9th Cir. 2002) (same).[9]  The habeas court then
"consider[s] all the evidence, old and new, incriminating and
exculpatory," admissible at trial or not, and, "[o]n this complete
record, the court makes a probabilistic determination about what
reasonable, properly instructed jurors would do." <u>Lee</u>, 653 F.3d at
938 (internal quotation marks omitted) (quoting <u>House v. Bell</u>, 547
U.S. 518, 538 (2006) and <u>Carriger v. Stewart</u>, 132 F.3d 463, 477–478
(9th Cir. 1997) (en banc)).  Even where post-conviction evidence
merely "casts doubt on the conviction by undercutting the reliability
of the proof of guilt, but not by affirmatively proving innocence,
that can be enough to pass through the <u>Schlup</u> gateway to allow
consideration of otherwise barred claims." <u>Lee</u>, 653 F.3d at 938
(quoting <u>Sistrunk v. Armenakis</u>, 292 F.3d 669, 673 (9th Cir. 2002) (en
banc)).[10]

The court's analysis necessarily includes an assessment of "the
probative force of the newly presented evidence in connection with the
evidence of guilt adduced at trial." <u>Schlup</u>, 513 U.S. at 331–332.

---

[9]    "New" evidence does not necessarily mean newly discovered
evidence.  Rather, it also includes evidence which was available but
was not presented at trial. <u>Griffin v. Johnson</u>, 350 F.3d 956, 963 (9th
Cir. 2003), <u>cert. denied</u>, 541 U.S. 998 (2004).

[10]    Both parties have submitted exhibits that arguably do not
satisfy the rules of evidence, including, for example, interviews
referenced in books or copies of newspaper articles containing
hearsay.  <u>Schlup</u>, however, makes clear that this Court "is not bound
by the rules of admissibility that would govern at trial." <u>Schlup</u>,
513 U.S. at 327–328 (quoting Friendly, *Is Innocence Irrelevant?
Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160
(1970)).  Further, neither party has objected to the Court considering
any of the lodged documents or exhibits submitted by the other.
Accordingly, the Court considers all of the documents and exhibits
presented by the parties regardless of their admissibility.

Further, a petitioner's diligence, including any unexplained delay in presenting new evidence, bears on the probable reliability of the evidence and the ultimate determination whether the petitioner has made the requisite showing of actual innocence. <u>Perkins</u>, 133 S.Ct. at 1935-1936 (citing <u>Schlup</u>, 513 U.S. at 332).

**1.    Evidence presented at trial**

In order to provide context for evaluating petitioner's new evidence, a brief summary of the evidence presented at trial is necessary.[11]

At the trial it was undisputed that defendant fired the shot that killed Senator Kennedy. The evidence also established conclusively that he shot the victims of the assault counts. The principal defense relied upon by defendant was that of diminished capacity. Extensive evidence was presented of the circumstances surrounding the shootings and of defendant's mental condition, which evidence may be summarized as follows:

About 8:30 p.m. on June 2, 1968, two days before defendant shot Senator Kennedy, the senator made a speech in the Coconut Grove at the Ambassador Hotel in Los Angeles, following which he delivered a second speech outside the hotel. Defendant was seen at the hotel about 8:45 that

---

[11]    After independent review of the record, the Court adopts the California Supreme Court's factual summary as a fair and accurate summary of the evidence presented at trial. <u>See</u> <u>Sirhan</u>, 7 Cal.3d at 717-726.   The factual summary is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). <u>See</u>, <u>e.g.</u>, <u>Slovik v. Yates</u>, 556 F.3d 747, 749 n.1 (9th Cir. 2009); <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

1   night by an acquaintance. A half hour or less after the

2   senator's second speech a hostess saw a man who looked like

3   defendant in the kitchen near the Coconut Grove.

4        During the day on June 4, 1968, defendant practiced

5   firing at a gun range for several hours and had also

6   practiced shooting at ranges on several prior occasions. On

7   June 4 he engaged in rapid fire with the .22 revolver he

8   used a few hours later to kill Senator Kennedy. The revolver

9   had been obtained by defendant in February 1968 when his

10  brother Munir paid a fellow employee for it.

11       A person who talked with defendant at the gun range on

12  June 4 testified that defendant stated he was "going to go

13  on a hunting trip with his gun," that he told defendant it

14  was not permissible to use pistols for hunting "because of

15  the accuracy," and that defendant said, "Well, I don't know

16  about that. It could kill a dog."

17       About 10 or 11 p.m. on June 4, 1968, a secretary whose

18  duties included seeing that unauthorized persons were not

19  near the Embassy Ballroom of the Ambassador Hotel, saw

20  defendant near that room and asked him who he was, and he

21  turned and walked toward the doors leading into the

22  ballroom.

23       Shortly before midnight on the same day defendant asked

24  hotel employees if Senator Kennedy was going to come through

25  the pantry, and they told him that they did not know. One of

26  the employees observed defendant for about a half hour in

27  the pantry and noticed nothing unusual about his manner or

28                          19

activity.

About midnight on June 4, Senator Kennedy made a speech in the Embassy Ballroom announcing his victory as a Democratic candidate for president in the California primary. Following the speech he and his entourage proceeded toward the hotel's Colonial Room, which was then being used as a press room. En route the senator stopped in the pantry to shake hands with the kitchen staff. Suddenly defendant darted toward the senator, pulled out a revolver, and fired several shots. The senator and a man adjacent to him, Paul Schrade, fell. Pandemonium ensued.

A hotel employee grabbed defendant around the wrist of the hand holding the gun, but defendant, who was still able to move that hand, continued shooting. Irwin Stroll, William Weisel, Elizabeth Evans and Ira Goldstein were injured by the gunfire. Several persons joined in the struggle and succeeded in restraining defendant, and one took the gun from him. When asked, "Why did you do it?," defendant replied something to the effect "I can explain."

The senator was taken to a hospital where he underwent surgery. He subsequently died on June 6, 1968. According to the autopsy surgeon, the cause of death was a gunshot wound "to the right mastoid" that penetrated the brain; the senator also received two additional gunshot wounds, one in an armpit and another slightly lower. Expert testimony indicated that the gun was an inch and a half or less from the senator's head when the fatal bullet was fired and in

20

1   contact with him or within a few inches when the other

2   wounds were inflicted.

3       Around the time that the senator was taken to the

4   hospital the police arrived at the hotel and took custody of

5   defendant. Two officers, defendant and Jesse Unruh got into

6   a car and drove to the police station. En route the officers

7   advised defendant of his constitutional rights. Subsequently

8   Unruh asked defendant "Why did you shoot him?" and defendant

9   replied "You think I am crazy? You think I will tell you so

10   you can use it as evidence against me?" Unruh also heard

11   defendant say "I did it for my country." Unruh believed that

12   defendant was not intoxicated, and police officers who were

13   with defendant at the time of his arrest or shortly

14   thereafter reached the same conclusion.

15       About 12:45 a.m., minutes after defendant arrived at

16   the police station, he was seen by Officer Jordan. The

17   officer estimated that he was with defendant between four

18   and five hours on this occasion. Jordan stated that

19   defendant never appeared irrational and that in the

20   officer's many years on the force defendant was "one of the

21   most alert and intelligent people I have ever attempted to

22   interrogate." Jordan initially identified himself and asked

23   defendant his name but received no response. The officer

24   then advised defendant of his constitutional rights, and

25   defendant, after asking a few questions, indicated he wished

26   to remain silent. Defendant, Jordan, and other officers

27   subsequently discussed various matters other than the case.

28                 21

1       Tapes of the conversations were played to the jury.

2           The police found various items on defendant's person,

3       including a newspaper article which in part noted that in a

4       recent speech Senator Kennedy "favored aid to Israel 'with

5       arms if necessary' to meet the threat of the Soviets."

6           A trash collector testified that on one occasion he

7       told defendant he was going to vote for Kennedy in the

8       primary election and that defendant replied "What do you

9       want to vote for that son-of-a-b for? Because I'm planning

10      on shooting him." On cross-examination the witness admitted

11      that following the assassination when asked if he would

12      testify he stated he "would not want to take the oath

13      because (he) hated Sirhan so much that (he) would do

14      anything to see him convicted."

15          The prosecution also introduced documents found by the

16      police at defendant's home. The documents contain statements

17      in defendant's handwriting regarding various matters

18      including, inter alia, killing Senator Kennedy.[12]

19

20      _____

        [12]    Later  in  the opinion, the California Supreme Court
21      summarized the contents of these documents as follows:

22          For example, one of the pages introduced by the defense
            (which had been excluded by the trial court when the
23          prosecution attempted to introduce it) stated in part "I
            advocate the overthrow of the current president to the
24          fucken (sic) United States of America. I have no absolute
            plans yet — but soon will compose some. I am poor — This
25          country's propaganda says that she is the best country in
            the world — I have not experienced this yet.... I firmly
26          support the communist cause and its people — wether (sic)
            Russian, Chinese, Albanian, Hungarian or whoever — Workers
27          of the World unite, you have nothing to loose (sic) but your

28                                      22

1    Defendant, testifying in his own behalf, admitted
2    having shot Senator Kennedy, but claimed that he did not
3    remember having done so. He conceded, however, that he
4    stated "I killed Robert Kennedy wilfully, premeditatively,
5    with twenty years of malice aforethought." ... Defendant
6    further testified that he 'must have,' or had no doubt that
7    he, shot the victims of the assault counts.
8        Defendant's account of what transpired on June 4 and 5,
9    was as follows: He intended to go to the races on June 4,
10   but did not like the entries and decided to go target
11   shooting instead. He took his revolver to a gun range,

12   ───────────────
13   Chains and a world to win." Other pages introduced by the
     defense stated, "2 June 67 . . . A Declaration of War
14   Against America ... When in the course of human events, it
     has become necessary for me to equalize and seek revenge for
15   all the inhuman treatment committed against me by the
     American people the manifestation of this Declaration will
16   be executed by its purporter (s) (sic) as soon as he is able
     to command ... $2000 ... and to acquire some firearms ....
17   The victims of the party in favor of this declaration will
     be or are now — the president, vice etc — down the ladder.
18   The time will be chosen by the author at the convenience of
     the accused ... the author expresses his wishes very bluntly
19   that he wants to be recorded by historians as the man who
     triggered off the last war ... Sirhan must begin to work on
20   uphold (sic) solving the problems and difficulties of
     assassinating the 36th president of the glorious United
21   States."

22   Sirhan, 7 Cal.3d at 734 n.13.

23       In addition, the prosecution introduced evidence of an envelope
24   bearing the notation "RFK must be disposed of like his brother was;"
     a notebook containing "a prediction of America's downfall, an attack
25   upon its leaders, and comments relating to 'doing away' with those
     leaders;" and a second notebook which included notations such as
26   "R.F.K. must be assassinated" and "Ambassador Goldberg must die." The
     handwriting on the envelope and in the notebooks was identified as
27   petitioner's. Sirhan, 7 Cal.3d at 736, 741.

28                                  23

1    stopping en route to buy ammunition, and stayed at the range

2    until about 5 p.m. He practiced shooting there but was not

3    the person who engaged in rapid fire. He had gone to gun

4    ranges on several prior occasions and practiced with the gun

5    because he "liked to" and "was interested ... in ... target

6    practicing perfection." He first developed an interest in

7    guns as a member of a high school cadet corps. He did not

8    recall making a statement about killing a dog. He might have

9    said "it (apparently his gun) is strong enough to kill an

10   animal," but he did not have in mind killing Senator

11   Kennedy. After leaving the range, he stopped to eat and

12   subsequently saw an article concerning a march for Israel,

13   which made him angry. He drove to the area where the march

14   was scheduled but found it was not on that date. On the

15   drive he passed Thomas Kuchel's headquarters and went in.

16   There someone mentioned a "bigger party" at the Ambassador.

17   The person did not mention whose party it was, and defendant

18   did not know there was to be a Kennedy party that night. He

19   went to the Ambassador, was mad at the Zionists, and started

20   to drink. He bought two Tom Collins during about an hour. He

21   does not recall how many drinks he had that evening. After

22   a while he felt high and returned to his car to go home but

23   was afraid to drive because of his condition and decided to

24   return to the hotel for coffee.

25        He did not recall picking up his gun but as a result of

26   what subsequently transpired he realized he must have done

27   so. Upon returning to the Ambassador, he found some coffee

28                              24

1    and talked with a girl. The next thing he remembered he was

2    being choked.

3        He did not remember asking anyone "where Kennedy was

4    going to come through" and did not know if he asked "what

5    time (Kennedy) would be there." He did not remember saying

6    "I did it for my country" but "Jesse Unruh must have been

7    correct in saying that (defendant made the statement)." He

8    recalled getting into the police car, being advised of his

9    constitutional rights, and various other matters following

10   his arrest.

11       Defendant also admitted having gone to the Ambassador

12   Hotel on June 2 where he heard Senator Kennedy speak but

13   denied having been in the kitchen that night. He stated that

14   the senator "looked like a saint" but that defendant still

15   had in the back of his mind a broadcast in which the senator

16   committed himself to sending jet bombers to Israel.

17       Defendant denied having made the statement to the trash

18   collector regarding killing Senator Kennedy.

19   Defendant further testified regarding his background as follows:

20   He is a Palestinian Arab. He was born in 1944 in New Jerusalem, and in

21   1948 he and his family moved to Old Jerusalem where they remained

22   until coming to the United States in 1956. Throughout his eight years

23   in Old Jerusalem there were intermittent bombings. He attended school

24   there. His family lived under poor conditions in Old Jerusalem (e.g.,

25   the whole family resided in one room with grossly inadequate toilet

26   facilities). He was told they were living as they were because "The

27   Jews kicked us out of our home." He was also told of a massacre in

28                                25

which 250 people including children were slaughtered in cold blood by the Jews. While living in Old Jerusalem he went to a well for some water, and when the bucket came up it contained a hand and it sickened him. On one occasion he saw the exploded remains of a grocer he knew. In 1956 he heard about aggression by Israel against the Arabs in the Suez Canal. About a year after they came to the United States his father returned to Jordan. In 1963 defendant graduated from high school and subsequently attended college, but was dismissed in 1965 after missing classes. He thereafter worked with horses but left his job in 1966 and did not find another job for a year. He read everything available on the Arab-Israel conflict and on the occult, in which he became interested in 1965. He joined the Rosecrucian Order in 1965. He performed several experiments such as concentrating on a mirror and seeing the face of Robert Kennedy instead of his own.

Defendant also described in detail his views regarding the Arab-Israel conflict and his hatred of the Zionists.

Additional evidence was introduced by the defense regarding the bombings in Old Jerusalem during the period defendant resided there, the various gruesome matters he saw during his childhood, and his poor living conditions in that city. Several defense witnesses also testified that they saw defendant with a drink in his hand on the night of June 4, 1968.

In support of his defense of diminished capacity defendant called to the stand two psychiatrists Eric Marcus, M.D. (a court-appointed psychiatrist) and Bernard Diamond, M.D.; two psychologists who administered psychological tests

26

to defendant (Drs. Orville Richardson and Martin Schorr) and four psychologists who evaluated the tests administered to defendant by Dr. Richardson and/or Dr. Schorr (Drs. Stephen Howard, William Crain, Georgene Seward, and George De Vos).

Doctors Marcus and Diamond testified that at the time of the alleged murder defendant was a paranoid schizophrenic, and Dr. Diamond further stated that defendant was then in a "dissociated state of restrictive consciousness as a ... consequence of (his) psychotic condition." According to both psychiatrists, defendant lacked the capacity to maturely and meaningfully reflect upon the gravity of the contemplated act of murder and to comprehend his duty to govern his actions in accord with the duties imposed by law, and they explained the reasons for their conclusion. They further testified concerning the origin, development, and manifestations of the illness.

Doctors Richardson, Schorr, Crain, De Vos and Seward likewise testified that defendant was a paranoid schizophrenic, and, according to Dr. Schorr, defendant went into a dissociate state before the shooting. Doctors Richardson and Schorr also agreed with the psychiatrists that defendant lacked the capacity to maturely and meaningfully reflect upon the gravity of his contemplated act of murder and to harbor malice aforethought.

Dr. Howard concluded that defendant has "paranoid features" and is "a borderline psychotic person," i.e., a person "who can go in and out of psychosis, depending on the

27

1          ... relative minor stresses ... in daily life."

2          In rebuttal the prosecution called to the stand Seymour

3    Pollack, M.D., a Professor of Psychiatry and Law at the

4    University of Southern California. Dr. Pollack interviewed

5    defendant eight times, spending about 24 hours with him. The

6    first such interview was on January 19, 1969. The doctor

7    also observed defendant in the courtroom during preliminary

8    proceedings that began June 28, 1968, and during the trial.

9    In addition he interviewed members of defendant's family;

10   reviewed the psychological tests given by Drs. Richardson

11   and Schorr to defendant and numerous other matters such as

12   the grand jury transcript and tapes of defendant's

13   conversations after his apprehension; and attended a

14   conference with other psychiatrists and psychologists

15   concerning the case. The overall time Dr. Pollack spent on

16   the case was close to 200 hours.

17         With respect to his diagnosis, Dr. Pollack testified:

18   Defendant was not "clinically psychotic," i.e., there were

19   "no observable signs or symptoms to a degree and of a kind

20   that would allow (the witness) as a psychiatrist to say that

21   (defendant) was mentally ill as a psychotic person." There

22   was insufficient proof of schizophrenia.

23         On the other hand, according to Dr. Pollack, defendant

24   is, and was at the time of the killing and for "some time

25   before that," mentally ill and emotionally disturbed, and

26   his mental illness was substantial, i.e., of a degree and

27   kind that is not present in most of the population.

28                                    28

1    Dr. Pollack concluded that defendant is a paranoid
2    personality, which is not a psychosis but a form of mental
3    illness in which there is an exaggeration of certain
4    personality characteristics. Such a personality is more
5    suspicious and sensitive than most people, "takes things
6    more personally to a greater degree than the average
7    person," and tends to collect grievances.

8    Dr. Pollack testified that defendant also is "a
9    borderline schizophrenic," i.e., "a person who has ... or
10   shows some minimal evidence of peculiarity in his thinking,
11   in his feeling ... but who doesn't have, who hasn't shown
12   ... any clinical signs or symptoms of psychosis." According
13   to Dr. Pollack, there are indications that defendant has "a
14   psychotic personality structure," and a person with such a
15   structure is not "held together as well" and becomes "more
16   easily unglued than ordinary."

17                          * * * * *

18   Dr. Pollack further testified that "I believe the
19   assassination of Senator Robert Kennedy was triggered by
20   political reasons with which (defendant) was highly
21   emotionally charged; I believe that Sirhan focused on
22   Senator Robert Kennedy as an individual who should die, not
23   only because of the Kennedy promise to give Israel the jet
24   bombers that would cause death to thousands of Arabs, in
25   Sirhan's opinion, but also because Sirhan wanted the world
26   to see ... how strongly our United States policy was in the
27   pro-Israel-anti-Arab movement in ... spite of our

28                              29

Government's professed interest for the underdog, and world justice" and "Sirhan ... saw himself as a defender of the Arab cause and, as an individual who through this act would bring world attention to the Arab plight and also ... materialize his fantasy of success."

He testified, "In my opinion when Sirhan shot Kennedy, Sirhan's mental capacity was not impaired to the extent of diminished capacity to maturely and meaningfully premeditate and deliberate and reflect upon the gravity of the contemplated act of shooting the Senator" and that Sirhan "did not have ... diminished mental capacity to harbor malice aforethought." The doctor explained that he considered the following "functions" in reaching the foregoing conclusions: He found no evidence of any altered state of consciousness or dissociate state, and various matters indicated to the contrary. For example, testimony of eyewitnesses showed defendant was aware of the significance of questions asked him and the tape recordings of his conversations at the police station indicated "a great deal of reasoning ability." There was no substantial impairment of his attention (i.e., ability to attend to his environment in a meaningful manner), perception (i.e., ability to perceive objects in a meaningful manner, using past experiences), understanding (i.e., ability not simply to know but to appreciate "in a fuller sense"), ability to associate ideas logically, and freedom of choice. His emotions were "not that disturbed." He was becoming more

1    irritable and explosive but there was no substantial

2    evidence that "this was an impulsive explosion." His

3    foresight (i.e., his ability to look forward and plan)

4    appeared to be reasonably intact, and the same was true

5    regarding his memory.

6                          *  *  *  *  *

7        Dr. Pollack also testified that defendant believed it

8    was "good" and "right" to kill Senator Kennedy and had that

9    belief when he made the entries in his notebooks. Defense

10   counsel then asked, "As a matter of fact, he felt it was his

11   duty almost to do it, didn't he?", and Dr. Pollack replied,

12   "Almost, yes. As an Arab he felt that it was his duty, that

13   he would be looked up to by the Arab world and that he would

14   be considered a hero." Dr. Pollack indicated that he did not

15   consider defendant's belief that it was "right" and "good"

16   to kill the senator a delusion and stated that "it's there

17   that I think a major difference exists between the other

18   psychiatrists and myself." He testified defendant gave no

19   evidence of believing himself to be a person chosen by God

20   to kill Kennedy whom he regarded as the devil – that such a

21   belief would have been a delusion. Dr. Pollack further

22   testified that defendant did not expect to be punished for

23   his act because in his view Kennedy and others having the

24   senator's views about the Arab-Israel conflict were

25   murderers.

26   Sirhan, 7 Cal.3d at 717-726 (footnotes omitted).

27        **2.    "New evidence"**

28                                    31

1    In support of his claim that he falls within the actual innocence

2    exception to the statute of limitation, petitioner relies on the

3    following evidence: an audio analysis of the Pruszynski tape recording

4    concluding that more than eight shots were fired; eyewitnesses who

5    said that petitioner was in front of rather than behind Senator

6    Kennedy, and too far away to have inflicted the fatal wounds;

7    witnesses who heard more than eight shots and eyewitnesses who saw a

8    second shooter; ballistics evidence demonstrating that the bullet

9    identified as the "Kennedy neck bullet" was not fired from

10   petitioner's gun; and the opinion of Dr. Daniel Brown that petitioner

11   was subjected to mind control or hypno-programming. [DN 180 at 15-35;

12   see also DN 153 at 37-57; DN 195 (Sur-Reply on Issue of Actual

13   Innocence) at 2-36].[13]

14       The evidence regarding the possibility that there were more than

15   eight shots fired, problems with the ballistics evidence, and

16   eyewitnesses is intended to show that although petitioner was in the

17   kitchen pantry and fired his gun at Senator Kennedy, he did not fire

18   the bullet that ultimately hit and killed Senator Kennedy; rather, a

19   second shooter fired the Kennedy neck bullet and is responsible for

20   the death of Senator Kennedy. The psychological evidence is intended

21   to show that petitioner was not responsible for the murder of Senator

22

23       [13] Both the petition and portions of petitioner's briefs
     addressing the merits of his claims include numerous other allegations
24   and citations to evidence relating to, among other things, the alleged
     existence of a second shooter and revelations of purported anomalies
25   and inconsistencies in the prosecution's evidence. The Court's
     discussion is restricted to the evidence that petitioner's counsel has
26   identified as supporting petitioner's claim that he falls within the
     actual innocence exception to the statute of limitation. Accordingly,
27   petitioner's numerous other allegations are not addressed.

28                                      32

Kennedy because he was essentially unconscious at the time he fired his gun and was acting under the psychological manipulation of an unnamed person or persons.  Thus, on petitioner's theory, whether or not petitioner fired the bullet that killed Senator Kennedy, he is not liable for the murder.

**The Pruszynski recording**

In 2005, Philip Van Praag examined the Pruszynski recording and identified thirteen distinct "shot-sounds" on the tape.  Based upon his analysis, Van Praag concluded that two different guns had been discharged – petitioner's, which fired eight shots from east to west, and a different gun, which fired five shots from west to east. According to petitioner, Van Praag's analysis "conclusively demonstrates that there was in fact an additional shooter" because petitioner's revolver could only fire eight shots.  Van Praag also opined that some of the shots were fired so close together in time that they could not have come from the same weapon. [DN 153 at 38-40, Ex. A (Joling Declaration); DN 180, Ex. C (Van Praag Declaration)].

Van Praag's opinion is far from "conclusive" evidence of a second gunman because other experts analyzing the Pruszynksi recording have reached contrary conclusions. [LD 17 (Mel Ayton, *How the Discovery Channel Duped the American Public About the RFK Assassination Acoustics Debate,* George Mason University's History New Network, November 20, 2007); LD 18 (Steve Barber, *The Robert F. Kennedy Assassination: The Acoustics Evidence*, George Mason University's History News Network, March 25, 2007; LD 23 (Philip Harrison: Summary Curriculum Vitae); LD 24 (analysis of the Pruszynski Tape by Acoustics Expert Philip Harrison, Appendix B to Mel Ayton, *The Forgotten*

33

*Terrorist: Sirhan Sirhan and the Assassination of Robert F. Kennedy* (Potomac Books, 2007)].[14]  In any event, as discussed in detail below, evidence that another firearm was discharged during the assassination is not sufficient to demonstrate that petitioner is innocent.

**Eyewitnesses to petitioner's position at the time of the shooting**

Petitioner alleges that twelve or more eyewitnesses could have testified that they observed petitioner to be in front of Senator Kennedy and at least one foot away from him at the time of the initial gunshot.  He also alleges that witnesses could have testified that petitioner's hand was pinned down after he fired two or three shots. Petitioner contends that this evidence would have proven that he could not have shot Senator Kennedy because Senator Kennedy was shot point blank from behind. [DN 180 at 20-24 & Ex. A (summary of eyewitness evidence regarding petitioner's position); DN 195 at 30-36 (discussion of how eyewitness evidence would demonstrate petitioner's innocence)].

**Evidence that petitioner was "in front" of Senator Kennedy**

One flaw with the eyewitness evidence relied upon by petitioner is that none of the witnesses actually saw petitioner at the moment

---

[14]    In particular, Phillip Harrison, a forensic audio examiner from the United Kingdom, analyzed the Pruszynski recording and concluded that no more than eight shots were fired. [LD 24]. Petitioner complains that Harrison's opinion is not reliable because Harrison did not know where in the room the Pruszynski microphone was located, and because he "appeared" to be working from a dubbed copy of one of Van Praag's master recordings. [DN 180 at 18].  Petitioner also attacks the reliability of another expert, Steve Barber, whose conclusion contradicted Van Praag's.  The Court need not resolve petitioner's challenges, which are directed to the weight or credibility of expert opinions that contradict Van Praag's opinion. The existence of contradictory expert opinions is sufficient to preclude Van Praag's opinion from constituting "conclusive" proof of petitioner's theory.

Senator Kennedy was first shot. All were looking elsewhere, mostly at Senator Kennedy, and were startled by the sound of what many believed was a firecracker. The witnesses on whom petitioner relies saw the gunman stepping or rushing toward Senator Kennedy, then reaching or lunging toward Senator Kennedy, extending his hand toward Senator Kenney as if to shake his hand, pointing a revolver toward Senator Kennedy, and then firing that gun at Senator Kennedy. They also saw Senator Kennedy move his hand up toward his face immediately after the first shot. [DN 180, Ex. A]. These eyewitness accounts are consistent with the testimony presented at trial regarding the movements of the gunman and Senator Kennedy immediately before and after the first shot. [See RT 3097-3101, 3123, 3130-3133, 3189, 3203, 3213-3216, 3220, 3387, 3396-3398, 3401, 3423-3426; see also RT 4529-4531 (Noguchi's testimony that based upon the gunshot wounds, Senator Kennedy moved his arm between two of the gunshots)].

Many of the witnesses on whom petitioner relies – namely, Edward Minasian, Juan Romero, Valerie Schulte, Karl Uecker, and Frank Burns – actually did testify at petitioner's trial that petitioner was in front of Senator Kennedy at the time of the shooting. [RT 3095-3097, 3155-3156, 3188-3189, 3396-3399, 3426-3427]. Thus, petitioner's position in front of Senator Kennedy at the time of the shooting is not new evidence, but rather evidence that the jury heard and concluded was either inaccurate, or true but consistent with petitioner having fired the fatal shot.

Perhaps most importantly, the eyewitness testimony consistently described Senator Kennedy as turning his head just as the shots were fired. That explains how the bullet could have struck the back of his

35

head even if petitioner was technically "in front" of Senator Kennedy. [See RT 3096, 3100-3102, 3220].

**Evidence that petitioner's hand was pinned down after firing the first shots**

According to petitioner, evidence of his innocence can be found in eyewitness accounts stating that petitioner's hand was pinned down by Minasian and Uecker after petitioner fired two or three shots and consequently petitioner's remaining shots were fired wildly around the pantry. [DN 180 at 23-24, Ex. B (summary of witness accounts)]. According to petitioner, this evidence demonstrates he could not have been in a position to fire the four close range shots that struck Senator Kennedy, because those shots were fired from behind and below Senator Kennedy. Petitioner's argument, however, is merely a new argument based upon the evidence introduced at trial. The evidence upon which it is based consists of the testimony of Minasian, Uecker, and Martin Patrusky. [See DN 180, Ex. B, RT 3095-3100, 3156-3160, 3387-3388]. The jury, however, heard evidence that Uecker and Minasian tackled petitioner after he fired two or three shots, and that the remaining shots were fired while petitioner's arm was pinned down on the steam table. Therefore, either the jurors concluded that this testimony was consistent with the forensic evidence or they believed that the eyewitnesses may have erred in calculating whether two, three, or more shots had been fired before they jumped into action.

In any event, this is not affirmative evidence that petitioner did not shoot Senator Kennedy. Senator Kennedy suffered three gunshot wounds, and all wounds were sustained in "rapid succession." [RT 4531-

4533]. Several witnesses, including Minasian, testified that petitioner fired three or four shots at Senator Kennedy before Uecker grabbed his arm, and that petitioner fired four or five more shots before the gun was pinned to the steam table. [RT 3097-3100, 3123-3124, 3130-3133, 3272, 3398-3399, 3452, 3474].

**Evidence that petitioner was too far away from Senator Kennedy to inflict the fatal gunshot wound**

Petitioner argues that none of the witnesses placed his gun within inches of Senator Kennedy, so he could not have fired the fatal shot. Petitioner relies on Uecker's testimony, but such reliance is misplaced because Uecker's account of the shooting is especially incriminating. Uecker testified that he held Senator Kennedy's right hand after his speech and guided him through the kitchen pantry on the way to the press room. [RT 3088]. Senator Kennedy stopped and let go of Uecker's hand several times in order to shake hands with kitchen staff. [RT 3090-3094]. Uecker remained within arm's reach of Senator Kennedy, with Senator Kennedy immediately to Uecker's left. When Senator Kennedy finished shaking hands with the last man, Uecker grabbed his hand and said, "Let's go now, Senator." [RT 3097]. Uecker turned toward the right and immediately felt someone brush in front of him, positioning himself between Uecker and the steam table. [RT 3095, 3097]. Uecker heard what sounded like a firecracker, then heard a shot. Senator Kennedy began to "fall out of" Uecker's hand. At this point, Uecker saw petitioner right in front of him holding a gun. [RT 3097]. Uecker grabbed for the gun and ended up forcing petitioner down onto the steam table, but petitioner continued to shoot. [RT 3097-3098]. Because Uecker was near enough to be touching Senator

37

Kennedy and petitioner passed so closely in front of Uecker that he brushed against him, Uecker's testimony actually undermines petitioner's contentions. From Uecker's testimony, the jury could have concluded that when petitioner stepped in front of Uecker, who was within arm's reach of Senator Kennedy, petitioner was close enough to have fired the fatal shot.[15]

Nevertheless, petitioner urges the Court to consider evidence that in 1975 Uecker said that petitioner's gun never came closer than 1.5 feet from Senator Kennedy. [See 1992 Request to the Los Angeles County Grand Jury February 20, 1975, Statement of Karl Uecker, found at www.maryferrell.org].[16]

Evidence that Uecker (or other eyewitnesses) did not see petitioner in the precise position that the autopsy report concluded the shooter must have fired from does not demonstrate petitioner's innocence. As a general matter, eyewitness testimony is notoriously inaccurate, even under far less chaotic circumstances. See Perry v. New Hampshire, 132 S.Ct. 716, 728 (2012) (noting research indicating

[15] For the same reasons, petitioner's reliance on Martin Patrusky's F.B.I. statement is unfounded. Patrusky observed a man "pushing his way toward Senator Kennedy and Karl Uecker.... He pushed himself around to the right of Uecker. This man leaned around the left side of Uecker's body and extended his hand toward Senator Kennedy.... I immediately heard a sound like that of a firecracker." [DN 180, Ex. A]. Patrusky's observations corroborate Uecker's testimony and place petitioner immediately next to Senator Kennedy.

[16] Contrary to his 1975 statement, Uecker did not testify to this, and his prior statements to police do not include a similar statement regarding the distance between petitioner's gun and Senator Kennedy. [See RT 3075-3133; September 11, 1968 Interview by F.B.I., found at maryferrell.org; June 5, 1968 Interview with LAPD, found at maryferrell.org]. Nevertheless, the Court assumes Uecker would testify that he never saw petitioner's gun get closer than 1.5 feet from Senator Kennedy.

that as many as one in three eyewitness identifications is inaccurate and stating that "[w]e do not doubt either the importance or the fallibility of eyewitness identifications."); United States v. Wade, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); Wise, Fishman & Safer, *How to Analyze the Accuracy of Eyewitness Testimony in a Criminal Case*, 42 Conn. L. Rev. 435, 452 (2009) ("For decades, psychologists and defense attorneys have maintained that eyewitness testimony can be notoriously unreliable, and courts, including the United States Supreme Court, have recognized this fact."). The scene after Senator Kennedy's speech was rife with circumstances that would render it difficult to observe with precision details such as distance – it was after midnight, hot, very crowded, and emotionally charged.[17] [See RT 3081-3086, 3105-3106, 3118].

Moreover, the ballistic evidence presented at trial corroborated the extensive eyewitness testimony that petitioner shot Senator Kennedy. Expert testimony showed that the three bullets removed from the victims, including the bullet that struck Senator Kennedy's neck, were fired from petitioner's revolver, and that these bullets were .22 caliber Mini-Mag ammunition.[18] [RT 4152-4153, 4165]. These bullets

[17]     Among the factors identified as relevant to determining the weight of eyewitness testimony include: the opportunity of the witness to observe the alleged perpetrator and criminal act, and the stress, if any, to which the witness was subjected at the time of the observation. See CALJIC No. 2.92.

[18]     Petitioner disputes the accuracy of the ballistics evidence, and his allegations are discussed in detail below.

were the same type of ammunition bought by petitioner just days before
the assassination. [RT 3762-3768, 3893-3897, 4070, 4076-4081, 5153].
In addition, when he was arrested, petitioner had two .22 caliber
bullets on his person. [RT 3517-3519].

This "new" evidence that the eyewitnesses all agreed that
petitioner fired his gun at Senator Kennedy but placed petitioner a
foot or so farther away from Senator Kennedy than the autopsy report
indicated he was, is not affirmative evidence of petitioner's
innocence. A jury presented with such testimony might find that the
eyewitnesses were not paying attention to petitioner's exact location
or were unable to accurately judge distances as a result of the
crowded and chaotic scene.

**Evidence about the angle of petitioner's gun**

Petitioner apparently believes that the observations of these
eyewitnesses also eliminate him as the shooter because the forensic
evidence showed that the shots were discharged at an upward angle, but
no witnesses testified that petitioner's arm and gun were in any
position other than a horizontal one. [DN 180 at 23]. Petitioner's
overinflated argument is easily punctured. First, the evidence showed
that the gunshot wounds were inflicted at merely a "very slightly
upward" angle. [RT 4525]. Second, as discussed, the eyewitnesses on
whom petitioner relies did not actually see Senator Kennedy get shot,
and none were able to describe the exact position of petitioner, the
gun, or Senator Kennedy at the crucial moment. [See DN 180, Exs. A &
B]. Instead, the witnesses describe a chaotic scene with abundant
motion, nothing about which precluded petitioner from firing his gun
at a "very slightly upward" angle. In fact, Lisa Urso observed

petitioner extend his right arm in an "upward position" just before shooting his gun. [DN 180, Ex. A at 8]. Furthermore, the height of petitioner compared with the height of Senator Kennedy provides a logical explanation for the slight upward angle of the bullet. [RT 4514 (Senator Kennedy was five feet, ten and a half inches); LD 11, Ex. 21 (Declaration of Robert Blair Kaiser stating that petitioner is five feet, six inches).

In sum, nothing about these eyewitness accounts rules out petitioner as the shooter.

**Ballistics evidence**

Petitioner alleges that contrary to the trial evidence, no match was ever made between the neck bullet actually removed from Senator Kennedy and petitioner's gun. Petitioner points out that Dr. Noguchi removed a bullet from Senator Kennedy's neck during the autopsy and placed a "TN31" mark on its base, but he was never asked to identify this bullet during his testimony. [DN 180 at 24-30]. The bullet was admitted into evidence as Exhibit 47 at trial based upon the testimony of criminalist DeWayne Wolfer, who testified that he compared the neck bullet and two bullets taken from other victims to test bullets fired by petitioner's gun and concluded that they had been fired from the same gun. [RT 4128-4194]. Because petitioner's counsel stipulated to the authenticity of the bullet, Wolfer was never asked whether Exhibit 47 bore the "TN31" mark. [RT 4129, 4157-4160].

Petitioner relies on the fact that Patrick Garland, one of the independent examiners in the 1975 reexamination, described Exhibit 47 as having the markings "DW" and "TN" on its base, but did not mention "31." Petitioner points out that Garland also described the bullet

41

that allegedly struck Goldstein as bearing the mark "6" even though the doctor who removed the bullet marked it with an "x." According to petitioner, this discrepancy demonstrates that Wolfer "substituted" bullets and lied when he testified that the bullets from the victims matched the test bullets fired from petitioner's gun. [DN 180 at 24-30 & 38-43].

To begin with, the problems with the ballistics evidence involve the bullet that struck Senator Kennedy in the armpit and traveled to his neck. This was not the fatal bullet. Rather, the bullet that penetrated Senator Kennedy's brain from behind his right ear was the cause of death. [RT 4517, 4524-4526, 4529, 4534].[19] Nevertheless, if petitioner could show that prosecution witnesses substituted bullets in order to obtain false testimony of a match between his gun and the bullets involved in the shooting, such evidence would undermine confidence in the jury's verdict of petitioner's guilt. For the following reasons, however, petitioner has not made such a showing.

During the 1975 reinvestigation of the ballistics evidence, Wolfer testified at length. He was asked to find his own initials on the neck bullet, which he did, stating they were on the "front of the bullet." [LD 27 at 247-250]. Writing belonging to both Wolfer and Dr. Noguchi was on the Coroner's evidence envelope containing the bullet; and Dr. Noguchi's writing was already on the envelope when Wolfer first received it before trial. [LD 27 at 261-264]. When

---

[19] This bullet shattered in Senator Kennedy's head and experts were unable to retrieve a sufficient portion of it to test. [RT 4525; LD 27 at 98; LD 6, Ex. N (Partial Transcript of Tomas Noguchi's Statements to Special Hearing Conducted by Supervisor Baxter Ward) at 86].

Garland prepared his evidence index for the 1975 reinvestigation, he noted the makings "TN" and "DW"[20] on the bullet, but not "31." [LD 6, Ex. E].[21]  The discrepancy is insufficient to show that petitioner's gun did not fire the fatal bullet, in part because Garland never indicated that the "31" was absent (perhaps because he simply was not asked to look for it).

Petitioner further alleges that Wolfer used a different revolver with a different serial number to test the bullets. [DN 180 at 28, 42-43].  This claim is based upon the fact that the evidence envelope containing the test bullets used to match the victim bullets to the gun retrieved from petitioner at the crime scene (serial no. H-53745) referenced a weapon with a serial number from a different gun that was not petitioner's (serial no. H-18602).  Despite the mismarking of the envelope, the trial testimony was clear that the test bullets introduced as Exhibit 55 had been fired from petitioner's revolver (Exhibit 6) and that Wolfer compared those test bullets with the victim bullets. [RT 4156-4160].  In addition, during the 1975 reinvestigation, Wolfer testified in detail about the erroneous serial number marked on the envelope for Exhibit 55.  He explained that on June 5, 1968, he obtained the revolver taken from petitioner (serial number H-53725), loaded it with eight bullets of the identical ammunition type removed from the victims, fired all eight test rounds

---

[20]    TN and DW are the initials for Thomas Noguchi and DeWayne Wolfer, respectively.

[21]    Of course, as petitioner was a party to the 1975 reinvestigation into the ballistics, this "evidence" was known to him at that time, a quarter of a century before he presented it in this federal habeas corpus petition. [See LD 27].

into a water tank, and recovered seven of them.  On that day or the following day, Wolfer compared one of the test rounds to the victim bullets. [LD 27 at 60-61, 107, 127-128, 170-171, 175, 177, 183, 193, 195-196, 335, 339].  Petitioner's gun was taken to the Grand Jury on June 6, 1968, and Wolfer testified before the Grand Jury on June 7, 1968. [LD 27 at 128].  Wolfer placed four of the test bullets into a Grand Jury evidence envelope [LD 27 at 114, 129; LD 6, Ex. L (photograph of envelope)], and took the remaining three bullets back to his office in case further testing was needed.  Those three remaining bullets were entered into evidence at petitioner's trial (Exhibit 55). [LD 27 at 103-105, 113-114, 120-123, 128-132, 136-139].  Grand Jury Exhibit 5B was dated on June 7, 1968, and contained the correct serial number from petitioner's gun (H-53725). [LD 27 at 179, 184-185, 188-189; see LD 6, Ex. L (photograph of Exhibit 5B)].  Exhibit 55 was not dated until the time of trial and contained the wrong serial number (H-18602). [LD 27 at 137-140, 185].  The error was discovered after the trial and the appeal concluded. [LD 27 at 122-125, 174-175].

Wolfer explained that on June 10, 1968, shortly after petitioner's gun had been placed in the custody of the Superior Court, Wolfer determined that he needed to run two additional tests, requiring either petitioner's gun or one of an identical make and model.  In particular, Wolfer needed to conduct a sound test (to determine whether it was possible that purported witnesses had heard gunshots from a certain location) and a gunshot residue test (to determine the distance from which the gun was fired when Senator Kennedy was hit). [LD 27 at 133, 159-160, 166, 175-176; RT 4181-4182,

4223]. Petitioner’s counsel was informed at trial that a different gun was used to conduct these additional tests. Moreover, Wolfer testified that he used a different gun, stating that he employed “a gun which was the exact make and model and within a very close serial number of [petitioner’s] weapon” to conduct the muzzle distance test. [RT 4179-4182]. Petitioner’s counsel cross-examined Wolfer on this point. [RT 4200-4206, 4223-4224].

In his 1975 reinvestigation testimony, Wolfer explained that he entered the wrong serial number on Exhibit 55 by mistake. He said that at the time of trial, several months after the test-firing, he requested the serial number from petitioner’s gun, but was given the number of the gun taken from the Los Angeles Police Department’s property department for use in the sound and muzzle distance tests. Consequently, Wolfer wrote that number (H-18602) by mistake. [LD 27 at 122-125, 140, 174-175, 185]. Wolfer clarified that he only test-fired petitioner’s gun to obtain bullets for comparison purposes. [LD 27 at 175].

As for petitioner’s contention that the 1975 reinvestigation panel concluded that the Kennedy neck bullet (as well as the bullets from victims Goldstein and Weisel) definitely were not fired from petitioner’s gun [DN 180 at 28], petitioner misrepresents the final report. Contrary to petitioner’s contention, the panel unanimously concluded that the three bullets were consistent with having been fired from the same gun, but the panel explained that a conclusive match to petitioner’s gun was impossible due to extrinsic factors, such as “barrel fouling” and “possible loss of fine detail over intervening years.” [LD 6, Ex. B].

In sum, petitioner has pointed out some gaps in the ballistics evidence. At best, however, petitioner has raised a question whether the bullet shown to Wolfer that he testified matched bullets fired from petitioner's gun was the same bullet that had been removed from Senator Kennedy's neck. Petitioner, however, must do more. Nothing petitioner has presented affirmatively shows that the bullet was in fact substituted for another, that the bullet identified as consistent with being shot from petitioner's gun was not the same as the one removed from Senator Kennedy's neck, or that there actually was an additional bullet.[22] Instead, the discrepancies that petitioner points out are equally likely to be the result of innocent mistakes or negligence, rather than a complex conspiracy involving numerous governmental officials and agencies.[23]

**Eyewitnesses who saw a second shooter**

Petitioner relies on two witnesses, Evan Phillip Freed and Booker Griffin, who said that they saw a second shooter. [See DN 153 at 40].

---

[22] As respondent points out, petitioner has been pursuing this claim since at least 1975. In 1975, petitioner sent a letter to Judge Wenke (who conducted the 1975 reinvestigation), alleging that the prosecution substituted false bullets in order to rig the ballistics evidence at trial. [LD 6, Ex. H (letter from petitioner to Judge Wenke)]. Despite the fact that petitioner – who has been represented by counsel – has been pursuing this claim for more than 30 years, he has been unable to produce any evidence affirmatively proving his conspiracy allegations.

[23] Petitioner's position requires the most sinister and convoluted reading of every piece of evidence. For example, petitioner contends that when Dr. Noguchi asked Robert Joling to hold onto an exhibit because "we might need it some day," Noguchi must have "strongly suspected that a major cover-up was in progress and that its extent and dimensions were so serious that nothing short of his removal of a crucial item of evidence for safekeeping would allow the truth to someday emerge." [Petition at 36].

According to Freed's 1992 affidavit (made nearly a quarter of a century after Senator Kennedy's assassination), Freed arrived in the pantry area five minutes before Senator Kennedy finished his speech. He noticed two men of "very similar" appearance "moving about the pantry area." The men "appeared to be looking at each other from time-to-time." One of the men was petitioner. Freed was four feet from Senator Kennedy when the shooting began. The man who had been in the pantry with petitioner during the speech pointed a gun at an upward angle toward Senator Kennedy. From the sound, it appeared to Freed that the first shot came from this man's gun. In the background, six or eight feet away, Freed saw petitioner firing a gun in the direction of Senator Kennedy. As the crowd rushed toward petitioner, they passed by the second gunman. The second gunman backed away. Freed then observed the second gunman running toward him, without a gun. Another man ran behind him in the same direction yelling, "stop that guy, stop him." The second gunman passed through the door, pursued by the other man. Freed never saw either man again. Freed told his story to the police, who suggested that he may have misheard the pursuer of the alleged second gunman. [Petition at 129-131].[24]

---

[24]    Petitioner has not submitted the actual affidavit, so the Court's citation is to petitioner's quotation of Freed's affidavit in petitioner's federal habeas petition. According to the petition, the affidavit was submitted to the California Supreme Court as Exhibit 88 to the 1997 habeas petition. [Petition at 131]. Although this Court requested and received the exhibits attached to petitioner's 1997 petition [DN 197], Freed's affidavit is not among the exhibits, nor, for that matter, are any of the exhibits numbered. For purposes of analysis, the Court assumes that petitioner's recitation of Freed's declaration is accurate.

Next, according to petitioner, Griffin said in a 1987 interview with author Philip Melanson that he was at the Ambassador Hotel on the night of the assassination and he saw petitioner with a taller man and a woman in a polka dot dress. [See DN 153 at 40; Petition at 131]. According to Griffin, petitioner shot at Senator Kennedy from a distance of eight or nine feet while the taller man shot Paul Schrade then ran out of the hotel with the woman.  Griffin also claimed that the other witnesses testified incorrectly because he was the first person to capture petitioner and he was pulled off petitioner by Rosie Greer and Rafer Johnson. [www.maryferrel.org, Ex. 33 to Request to Los Angeles County Grand Jury (interview of Griffin by Melanson on June 5, 1987)].[25]  Not only is Griffin's statement at odds with the statements of almost every other witness who was in the kitchen pantry that night, but it actually inculpates petitioner because Griffin is very certain that petitioner shot Senator Kennedy while the second gunman shot another victim.

\\

**Nina Rhodes-Hughes**

Petitioner relies on witness Nina Rhodes-Hughes, who also was in the kitchen pantry at the time of the shooting.[26]  According to Rhodes-

---

[25]    Again, petitioner has not submitted a declaration from Griffin.  For purposes of analysis, the Court assumes petitioner could obtain admissible evidence consistent with his recitation of Griffin's 1987 statements.

[26] Petitioner originally failed to submit a declaration from Rhodes-Hughes, but relied upon statements attributed to her in Melanson's 1998 book, *Shadow Play*. [DN 195 at 31].  After the original report was issued noting this failure, petitioner submitted Rhodes-Hughes's declaration as an exhibit to his objections.  The Court has discretion, but is not required, to consider the declaration.  See

Hughes, she was six or seven feet behind Senator Kennedy when she heard two or three "popping sounds" originating from her left. [Rhodes-Hughes Declaration at 3]. According to Rhodes-Hughes, Senator Kennedy "did not appear at that moment to have been wounded by those first couple of shots." [Rhodes-Hughes Declaration at 3]. Rafer Johnson and Rosie Grier ran to a spot to Rhodes-Hughes's left where the popping sounds had come from and joined others in an attempt to subdue a dark skinned man with a blue denim jacket. As the man was being subdued, Rhodes-Hughes heard gunshots originating from her right, where Senator Kennedy was located. The shots from the right "continued in a more rapid fire and with a different sound," and Senator Kennedy "had disappeared from [her] view." [Rhodes-Hughes Declaration at 4]. Rhodes-Hughes saw Senator Kennedy lying on the floor with blood next to his head. She screamed and then fainted. [Rhodes-Hughes Declaration at 4]. Rhodes-Hughes states that she "counted a total of between 12 and 14 shots fired in the kitchen

Akhtar v. Mesa, 698 F.3d 1202, 1208 (9th Cir. 2012); Brown v. Roe, 279 F.3d 742, 744-745 (9th Cir. 2002); United States v. Howell, 231 F.3d 615, 621 (9th Cir. 2000), cert. denied, 534 U.S. 831 (2001). Arguably, the circumstances of this case do not warrant consideration of the belatedly submitted declaration. In particular, petitioner is represented by competent counsel and has been since the date he filed his petition. The petition has been pending for more than 12 years, during which time the Court has granted numerous extensions of time and allowed petitioner to submit evidence supporting his claims. Petitioner knew about Rhodes-Hughes long ago, and has offered no explanation for his failure to submit a declaration before the report was issued. See Howell, 231 F.3d 622-623 (upholding the district court's decision not to consider new allegations made for the first time in objections to a report, noting that Howell, who was represented by counsel, had the opportunity to provide the specific facts earlier, but failed to do so, and also noting Howell did not provide an adequate explanation for his failure). Nevertheless, in the interest of a thorough analysis and record of petitioner's claims, the Court considers the declaration.

pantry from the two different locations." [Rhodes-Hughes Declaration at 4]. Finally, she says that the statements attributed to her in the 1968 F.B.I. interview – in which she is reported to have said that she heard eight shots fired – were inaccurate or falsified. [Rhodes-Hughes Declaration at 6-7].

The passage of nearly a half a century diminishes the reliability of Rhodes-Hughes's memory, and therefore, of her declaration. This is especially so given that there are no contemporaneous statements by Rhodes-Hughes that corroborate her current recollection of events now 45 years in the past.

In any event, Rhodes-Hughes's observations are similar to those previously discussed that suggest a second gunman may have been present. As discussed in detail below, even if petitioner's evidence were sufficient to permit a jury to find that there was a second shooter, it is not sufficient to warrant the conclusion that no reasonable jury apprised of the facts on which petitioner relies would have found petitioner guilty of killing Senator Kennedy, either as the principal, a conspirator, or an aider and abettor.[27]

**Analysis**

Considered together, petitioner's evidence does not approach the showing required by <u>Schlup</u> that he is actually innocent. Petitioner's evidence raises questions concerning the reliability or consistency of

---

[27]    It bears repeating that almost none of the evidence petitioner relies upon is "new" – in fact, most of it was known, or reasonably could have been known, to petitioner at the time of his trial. In particular, Freed's statements were known to petitioner in 1992, and Griffin's were known to petitioner in 1987. The strength of this evidence is reduced by the lengthy delay in presenting it. <u>See</u> <u>Perkins</u>, 133 S.Ct. at 1935-1936.

some of the evidence presented at his trial, but unresolved questions do not amount to new and reliable evidence of innocence. At best, petitioner's evidence suggests one possible alternative scenario, but it does not so undermine the evidence presented at his trial to the degree that a reasonable jury would not convict him.

It is noteworthy that petitioner has never denied – and could hardly do so in light of the evidence, including the fact that he was captured in the process of shooting Senator Kennedy – that he went to the Ambassador Hotel with a gun, waited in the pantry, approached Senator Kennedy with his gun drawn, and fired it eight times. Further, none of petitioner's new evidence discussed above undermines the extensive evidence of premeditation, including, for example, petitioner's statement in April 1968 to Alvin Clark that he was "planning on shooting" Senator Kennedy [RT 4012-4015], petitioner's "stalking" of Senator Kennedy by appearing at the Ambassador Hotel on June 2, 1968 [RT 4033-4049], petitioner's obtaining a gun, purchasing ammunition, and practicing at a target range on the day before the murder [RT 3567-3571, 3591-3600, 3622-3633, 3656-3662, 3667-3676], or petitioner's possession of newspaper clippings about Senator Kennedy when he was apprehended in the act of shooting him. [RT 3521-3522, 3526-3531].

Furthermore, petitioner himself has denied the plausibility of this second-shooter theory. During a parole hearing, petitioner stated:

If anybody else was involved, wouldn't I help myself after all these years, by telling authorities who else was in on it? The second gun theory is interesting but it is

51

implausible since I was not acting in concert with anyone
else.  The only one it could have been was a security guard
next to Kennedy, who might have fired by mistake.  Frankly,
for a long time I had encouraged those putting forth the
second gun theory.  I would have liked somehow to find out
that the fatal bullet had been fired by someone else.  But
is seems quite unlikely and besides, it would not erase what
I did.

[LD 8 (Bill Farr, *After 17 Years, "Ifs" Still Haunt Sirhan: Assassin
of Robert F. Kennedy Up for His 7th Parole Hearing,* Los Angeles Times,
June 24, 1985].[28]

Finally, even if petitioner could prove that a second gunman shot
Senator Kennedy, he still would be guilty of murder under California
law.  Evidence about a second gunman in the pantry does not negate the
testimony of numerous eyewitnesses that petitioner shot Senator
Kennedy, the documentary evidence that petitioner planned to shoot
Senator Kennedy, the evidence of petitioner preparing to put his plan
into action by obtaining a gun and practicing shooting, or any of his
admissions to intentionally shooting Senator Kennedy.  Even if the

---

[28]  The parties have not provided the Court with a transcript from
the 1985 parole hearing.  Petitioner, however, has not objected to
consideration of respondent's lodged document, nor has he disputed the
accuracy of the quote attributed to him.  In fact, in a 2010 letter to
his attorney, petitioner admitted making these statements, but
explained that he made them only because "it was literally inculcated
into me that I was the only person who killed Bobby Kennedy.  But,
when the LAPD released the files of my case to the State Archives in
1988 (?), and I began to hear from other inmates who watched T.V.
programs, that I could not have committed the crime, and later when
Lynn Mangan began to delve into the records at the Archives in
Sacramento, I began to question my involvement in this horrible
crime." [DN 135, Ex. 2].

second shooter's bullet was the one that killed Senator Kennedy, petitioner would be liable as an aider and abettor. See People v. Coffman, 34 Cal.4th. 1, 106-107 (2004) (explaining that an aider and abettor is guilty of both the offense he intended to facilitate or encourage and also of any reasonably foreseeable offense committed by the person he aids and abets), cert. denied, 544 U.S. 1063 (2005); see also People v. Sanchez, 26 Cal.4th 834, 845-849 (2001) (explaining that it is proximate causation, not actual causation, together with the requisite mental state (i.e., malice) that determines a defendant's liability for murder, and holding that even where it cannot be determined which of two defendants fired the single fatal bullet, both defendants could be found guilty of first degree murder where each fired at the victim with the requisite intent).

The foregoing analysis assumes that petitioner knew about the second shooter, which is both the only logical inference and the only scenario supported by petitioner's most favorable evidence. Freed, the primary witness supporting a second shooter theory, said that he saw two men, one of which was petitioner, who appeared to be together, exchanging glances while they waited in the pantry. [Petition at 130]. Likewise, Griffin, the other eyewitness who allegedly saw a second shooter, said that he saw petitioner with the second gunman. He also saw petitioner shoot Senator Kennedy. [www.maryferrel.org Ex. 33 to Request to Los Angeles County Grand Jury (interview of Griffin by Melanson on June 5, 1987)].

The alternative scenario – that unbeknownst to petitioner, a second unrelated person coincidentally showed up in the kitchen pantry at exactly the same time as petitioner did and proceeded to shoot

Senator Kennedy at close range with the same type of gun and ammunition as petitioner was using, but managed to escape the crowded room without notice of almost any of the roomful of witnesses, lacks any evidentiary support. Petitioner's counsel does not expressly advance such a far-fetched scenario. Accordingly, the Court does not address it.

Of course, petitioner does contend that he was subjected to "hypnotic programming," in which case the existence of another unknown shooter might exculpate him. As discussed below, however, petitioner has not presented sufficient reliable evidence that he acted under the influence of hypnotic programming on the night he shot Senator Kennedy.

**Evidence regarding hypnotic programming**[29]

Petitioner submits the declarations of Dr. Daniel Brown, an associate clinical professor of psychology at Harvard Medical School, and Professor Alan Scheflin, a law professor at Santa Clara University Law School. In his November 17, 2011 declaration, Scheflin states that based upon his research, including review of thousands of declassified Central Intelligence Agency ("CIA") documents, the "concept of hypnotic programming has been well known for more than a century," the American military began experimenting with mind control in the 1940s, and it can

---

[29] While the Court considers this and other new evidence for purposes of determining whether petitioner has made a sufficient showing of actual innocence, it notes that consideration of some of this evidence in the context of a determination of the merits of petitioner's claims may be precluded by <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398, 1400 (2011) (explaining that review under section 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits and federal courts may not consider evidence introduced for the first time in federal court).

be, and has been, used to induce antisocial conduct in humans. [DN 180, Ex. G (Declaration of Alan Scheflin) at 2-5].[30]  Scheflin states that "the creation of an hypnotically programed assassin or patsy (distractor) is possible only with a very small percentage of people who fall within the category of 'high hypnotizables.'"  Sirhan Sirhan, based upon Dr. Daniel Brown's extensive psychological testing and interviews with him, meets the criteria for "an ideal subject for this extreme form of mental manipulation." [DN 180, Ex. G at 6]. Scheflin provides a lengthy history of the study of the possible uses of hypnosis by the CIA, including projects researching whether a person could be hypnotized by phone, whether a person could be induced to commit murder or suicide, and whether it was possible to create full amnesia for actions taken under hypnosis.  The answer to all of these questions, according to Sheflin, is "yes." [DN 180, Ex. G at 22-24]. In fact, one CIA document from 1954 indicates that the agency was investigating whether an individual could "be induced under [hypnosis] to perform an act, involuntarily, of attempted assassination against a prominent [redacted] politician or if necessary, against an American official." [DN 180, Ex. G at 24-25].  In conclusion, Scheflin states that "it is possible, with a small select group of individuals, to influence the mind and behavior beyond legally and ethically permissible limits."  [DN 180, Ex. G at 30].

In his declaration filed on April 23, 2011, Brown states that in

---

[30]  For example, Scheflin quotes CIA memoranda from the 1950s indicating that the CIA was interested in "gett[ing] control of an individual to the point where he will do our bidding against his will and even against such fundamental laws of nature ... as self preservation...." [DN 180, Ex. G at 17].

May 2008, he began a detailed forensic psychological assessment of petitioner at the request of petitioner's counsel, who asked Brown to render an expert opinion as to whether or not petitioner "was a subject of coercive suggestive influence that rendered his behavior at the time of the assassination of Senator Robert F. Kennedy involuntary and also made him amnesic for his behavior and role in the assassination." [DN 153, Ex. I at 1-2]. Brown interviewed petitioner and performed numerous forensic psychological tests on him for more than 60 hours over a three year period. He also reviewed numerous files related to petitioner's case. [DN 153, Ex. I at 2-3]. Based upon his examination and test results, Brown concluded that petitioner is "the rare type of individual who could have been easily influenced/induced by others to engage in uncharacteristic actions for which he would subsequently become amnesic." [DN 153, Ex. I at 4]. Brown directly observed petitioner switch into a distinctly different "alter personality" state that responds in a robot-like fashion upon cue and adopts the behavior of firing a gun at a firing range, a personality state Brown refers to as "range mode." This personality state occurs only while petitioner is in a hypnotic state and in response to certain cues. Brown opines that this cue-specific "alter personality" state is likely the product of coercive suggestive influence and hypnosis. [DN 153, Ex. I at 4]. According to Brown, petitioner's test results place him in the top 7 percent of individuals in hypnotizability. [DN 153, Ex. I at 5-6].

In preparing his opinion, Brown gathered numerous "facts" from petitioner about petitioner's activities on the day of the assassination. According to petitioner, he did not plan to go to the Ambassador Hotel to kill Senator Kennedy. Rather, he went to look for

girls, on the suggestion of "some guys" who said there would be a big party there. Petitioner found the bar at the hotel. He had an unusual interaction with the bartender who communicated with him by using non-verbal signals. Petitioner had the feeling that they had a relationship, but could not remember the bartender. After petitioner drank alcoholic drinks he became very tired and he wanted to go home. He went to his car but realized he was too tired to drive, so he went back to the hotel to find coffee. [DN 153, Ex. I at 8-10].

When petitioner returned to the bar, the bartender told him there was no coffee. An attractive woman with a polka dot dress was at the bar talking to the bartender. She said she knew where the coffee was. She took petitioner by the hand and led him to the ante-room behind the stage where Senator Kennedy was speaking. They discovered a large coffee urn and poured coffee from it. They were interrupted by a man in a suit who told them that they could not stay there and instructed the woman in the polka dot dress to go to the kitchen. Petitioner was attracted to the woman, so he followed her. Petitioner was fascinated with the woman and thinking about seducing her. [DN 153, Ex. I at 10-11].

The woman suddenly looked over petitioner's head, then tapped or pinched petitioner. It was startling to be pinched, and it felt sharp like a pin or fingernail. The woman pointed and said "look." Petitioner was puzzled about what she meant, then people begin to come through the back doors. The woman put her arm on petitioner's shoulder. Then petitioner had a "flashback" to the shooting range. He did not know that he had a gun. But he saw a target. Petitioner loaded his gun and saw circles. He tried to hit the target and fired

57

1    one or two shots before snapping out of it and thinking, "I'm not at
2    the range," and then "what is going on?" People grabbed petitioner.
3    He did not realize until later that Senator Kennedy had been shot and
4    that he was the shooter. [DN 153, Ex. I at 11-13].

5        Brown gathered facts that petitioner's family and friends said
6    that petitioner "underwent a fundamental personality change after a
7    fall from a horse while racing at the Corona race track in September
8    25, 1966." Petitioner's medical records, however, showed no brain
9    injury. After the fall, petitioner was missing for two weeks.
10   According to Brown, these facts "suggest that the horse fall was drug-
11   induced and staged, and that Mr. Sirhan was taken to an unidentified
12   hospital unit for two weeks, and whatever was done to him caused a
13   fundamental change in his personality." [DN 153, Ex. I at 14-17].

14       In conclusion, Brown states:

15   I am convinced that Mr. Sirhan legitimately recalled a
16   flashback to shoot target circles at a firing range in
17   response to the post-hypnotic touch cue and did not have the
18   knowledge, or intention, to shoot a human being, let alone
19   Senator Kennedy. ... [I]t is my opinion that Mr. Sirhan did
20   not act under his own volition and knowledge or intention at
21   the time of the assignation and is not responsible for
22   actions coerced and/or carried out by others, and further
23   that the system of mind control which was imposed upon him
24   has also made it impossible for him to recall under hypnosis
25   or consciously, many critical details of actions and events
26   leading up to and at the time of the shooting in the panty
27   of the Ambassador Hotel.

28                                    58

[DN 153, Ex. I at 18].

In his supplemental declaration, Brown recounted that during hypnosis, petitioner recalled being taken to a police firing range and being shown how to shoot at human targets and vital organs. Petitioner remembered the name of the firing range and described a man with a moustache and a foreign accent who introduced him to the idea of killing government officials. According to Brown, an entry in police report corroborates that not only did such a police firing range exist, but that petitioner visited that police firing range and signed the register days before the assassination. He was accompanied by a man with a turned down moustache and a foreign accent who refused to identify himself or sign the register. [DN 180, Ex. H at 4-5].

Brown explains that on the night of the assassination, all that was required was for petitioner to show up at a designated place induced by post-hypnotic suggestion, to be led to the site by a handler, and then to adopt "range mode" upon cue. Brown states that such behavior is not difficult to induce in an individual who, like petitioner, is extremely vulnerable to hypnotic suggestion. At the time of the assassination, petitioner thought he was firing at stationary circle targets at a firing range. He did not know that he was firing at Senator Kennedy. [DN 180, Ex. H at 14-15].

As further support for his theory that petitioner was programmed to assassinate Senator Kennedy, and therefore is not legally responsible for his acts, Brown notes that:

> It is relevant that Petitioner was missing for two weeks
> after falling from a horse and came back "different"
> according to his family and friends. He remembers a

59

"prison-like" hospital unit where he drifted in and out of consciousness, likely under the influence of hallucinogenic or psychiatric drugs and hypnotic suggestions.

[DN 180, Ex. H at 20-21]. Brown also identifies "new evidence" supporting his theory, including:

strong scientific data for a range of the Petitioner's personality factors highly predictive of vulnerability to coercive persuasion; a memory of shooting upon cue; evidence of being missing for two weeks immediately after his horse injury during which he recalled a prison-like hospital unit; a memory of meeting a strange man with a foreign accent and turned down moustache who first introduced the idea that government officials needed to be killed; a memory of that same strange man sharing a mutual interest in short wave radios with the Petitioner (the Petitioner's passionate hobby as a short wave radio operator was never explored at trial); a memory of learning to shoot at vital organs and human targets with a "range master" at Corona Police Firing Range; corroboration that the Corona Police Firing Range actually existed and that petitioner signed in the Saturday before the assassination to practice at the Corona range days before the assassination accompanied by a man fitting the description of the strange man with the turned down moustache and foreign accent, who refused to sign in; and a memory that Petitioner often wrote in his spiral notebooks at night in an hypnotic state, while communicating with other parties on his short-wave radio.

[DN 180, Ex. H at 22-23].

Finally, Brown opines that petitioner's admissions, including his admission at trial, "exemplify a specific form of false confession," namely an involuntary internalized false confession. [DN 180, Ex. H at 23-24].

Brown agrees that most individuals cannot be induced to commit wrongful acts with hypnosis. In his opinion, however, petitioner is within the small 4 or 5 percent of individuals who are highly hypnotizable and socially compliant, with a high dissociative coping style, all which "predict strong vulnerability to undue suggestive influence or coercive persuasion, hypnotic and non-hypnotic." [DN 180, Ex. H at 13].

Brown notes that Dr. Simson-Kallas at San Quentin was asked to interview petitioner by the supervising psychiatrist because the supervising psychiatrist did not find any evidence to support the defense and prosecution experts' opinions that petitioner suffered from paranoid schizophrenia. Dr. Simson-Kallas concluded that there was no evidence for schizophrenia and that petitioner might have been "programmed." He was then taken off the case before he was able to further evaluate the question of hypnotic programming. [DN 180, Ex. H at 5-6].

On the other hand, respondent cites evidence suggesting that many or most scientists agree that hypnotized persons retain ultimate control over their actions and cannot be programmed to commit antisocial acts against their will. [DN 174 (Respondent's Supplemental Brief on Actual Innocence) at 12-13]. Brown himself concedes that there are two schools of thought regarding hypnosis and that experts

61

disagree on the very concept of what hypnosis is and what is able to achieve. [DN 180, Ex. H at 8-9].[31]

As respondent points out, the Ninth Circuit has said that, "it is clear that the mere presentation of new psychological evaluations ... does not constitute a colorable showing of actual innocence." Griffin v. Johnson, 350 F.3d 956, 965 (9th Cir. 2003)(quoting Harris v. Vasquez, 949 F.2d 1497, 1516 (9th Cir. 1990), cert. denied, 541 U.S. 998 (2004). As the court explained:

> "Because psychiatrists [let alone psychologists] disagree
> widely and frequently on what constitutes mental illness,"
> we have observed that evaluations such as Dr. Stanulis's
> merit little weight on habeas review because "a defendant
> could ... always provide a showing of factual innocence by
> hiring psychiatric experts who would reach a favorable
> conclusion."

Griffin, 350 F.3d at 965 (quoting Harris, 949 F.2d at 1515). The evidence of hypnosis relied upon by petitioner, including the opinions of Brown, is the type of evidence the Ninth Circuit has held are insufficient to make a colorable showing of actual innocence.

Even considering all of petitioner's new psychological evidence, he still fails to make the requisite showing. Petitioner's theory that he was subject to mind control may be intriguing, but in order to meet

---

[31] According to Brown, the two schools of thought "mainly disagree about whether or not hypnosis plays a special role in behavioral control...." He explains that in all laboratory research studies, "it was relatively easy to produce antisocial behaviors, with and without hypnosis. The only disagreement between socio-cognitive and state theorists is whether hypnosis contributes anything special to this end." [LD 180, Ex. H at 8-9].

the <u>Schlup</u> test, petitioner must establish that in light of this evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. The experts' statements about the feasability of hypno-programming and their opinions that petitioner was a good candidate for psychological manipulation may be sufficient to suggest that petitioner's mind-control theory is not impossible, but they fall far short of demonstrating that petitioner actually was subjected to mind control.[32]

Furthermore, petitioner's own recitation of the events leading up to the murder are vague and fail to demonstrate that he actually was the victim of hypno-programming by some unnamed person or entity. Petitioner's recently recalled memories about the bartender, the woman in the polka dot dress pinching him, and entering "range mode," are far from compelling evidence of his innocence. Petitioner's recitation of the events of the night he shot Senator Kennedy amount to self-serving recollections that, even if believed, do no more than suggest a sinister plot and a possibly exculpatory theory – namely, that petitioner was under a hypnotic trance and did not intentionally shoot Senator Kennedy. Whether or not the theory that a person can be hypnotized to commit murder and then to lose his memory of committing that murder is scientifically credible, and the Court assumes that it is solely for purposes of this analysis, petitioner has not provided any reliable evidence that this actually occurred. Evidence of a

---

[32] In the social security context, the Ninth Circuit has held that the opinion of a treating psychiatrist whose examination post-dated the alleged date of disability may be disregarded because "[a]fter-the-fact psychiatric diagnoses are notoriously unreliable." <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984).

mysterious woman in a polka dot dress, petitioner's "feeling" that he might have had a relationship with the bartender who used non-verbal signals such as nodding his head and making eye contact, petitioner's feeling "tired" after drinking alcohol, his following a woman whom he found attractive into the pantry,[33] the "pinch," and his subsequent drawing out the gun and shooting during his "flashback" to the shooting range are "facts" that could fit the mind control theory.[34]  Then again, they are fuzzy recollections of portions of a night more than forty years ago that contradict petitioner's prior, more contemporaneous statements.[35]

Moreover, the opinions of Brown and Scheflin are inconsistent with, and substantially contradicted by, the various psychiatrists who examined petitioner forty years earlier, contemporaneously with the

---

[33]    Among other things, most of these occurrences are commonplace and typically do not suggest anything out of the ordinary.

[34]    Petitioner's own story is internally inconsistent.  If petitioner was the subject of a sophisticated hypno-programming effort, it makes no sense that the only reason he ended up at the Ambassador Hotel was the chance suggestion by "some guys" who wanted to party and meet girls. [See DN 153, Ex. I at 8].

[35]    Some of the contradictory statements are found in petitioner's handwritten notes provided to defense investigator Michael McGowan, in which petitioner provides great detail about his actions at the Ambassador Hotel prior to the shooting.  These notes, filed under seal, contain a detailed account of petitioner's conduct that is not consistent with the account petitioner recently "recalled" during his interviews with Brown. [DNs 189-194 Declaration of Michael McGowan, Exs. D, E, F, G; LD 25 (letter between petitioner's investigator Michael McGowan and Dan Moldea dated February 25, 1995 indicating that petitioner recalled meeting Senator Kennedy's eyes just before shooting him, and when McGowan asked petitioner why he didn't shoot him between the eyes, petitioner answered, "Because that son of a bitch turned his head at the last second."].  Petitioner's inconsistent versions of events undermine the reliability of Brown's conclusions.

crime. Unlike the psychological experts who testified at petitioner's trial, Brown and Scheflin were unable to personally observe and examine petitioner in 1968 to render opinions about his then-current mental state. Thus, Brown's retrospective opinion based upon tests assessing petitioner's mental condition forty years after the fact are of negligible weight.

Based upon the evidence presented, and contrary to petitioner's argument, it is not likely that jurors would believe a defense that he was an involuntary actor who shot Senator Kennedy as a result of sophisticated hypno-programming and memory implantation techniques that rendered him unable to consciously control his thoughts and actions. Petitioner has presented a diverting – albeit farfetched – theory. But it is no more than that.

In sum, petitioner has presented evidence that arguably casts some doubt on the details or the reliability of some of the inculpatory evidence presented at trial (such as the ballistic evidence), evidence suggesting the possibility that another shooter could have been involved,[36] and evidence that a scenario under which petitioner acted under the influence of a form of mind control is, in the view of some, theoretically possible. Under Schlup, the Court must "assess how reasonable jurors would react to the overall, newly supplemented record," including all the evidence petitioner has submitted in this proceeding. House, 547 U.S. at 538. Considering all of the evidence, old and new, incriminatory and exculpatory, admissible and

---

[36] Since the fatal shot was at point-blank range, it seems highly unlikely that the unknown second shooter could have approached Senator Kennedy that closely, shot him, and then escaped a crowded room essentially unnoticed.

65

1   inadmissible, the Court cannot say that it is more likely than not that
2   no reasonable juror would have found petitioner guilty of the
3   assassination of Senator Kennedy beyond a reasonable doubt. See Lee,
4   653 F.3d at 943-945 (finding that the petitioner failed to satisfy the
5   actual innocence exception where he presented (a) an expert opinion
6   that the child victim's statements were not reliable; (b) a police
7   report showing that the boyfriend of the victim's babysitter had
8   molested the victim; and (c) evidence that the victim's babysitter
9   initially denied that the petitioner was present when she left the
10  victim at her apartment); Beaty v. Schriro, 554 F.3d 780, 784 (9th
11  Cir.) (noting that "mere speculation about a possible suspect is not
12  enough"), cert. denied, 491 U.S. 910 (2009); Griffin, 350 F.3d at 963-
13  965 (finding that the petitioner failed to make an adequate showing of
14  actual innocence based on newly presented psychiatric hospital records
15  indicating that the petitioner suffered from a kind of brain damage
16  with a history of aggressive behavior because the evidence would not
17  lead a reasonable juror to conclude that the petitioner could not have
18  formed the criminal intent necessary to commit murder over twenty years
19  later).

**Conclusion**

20
21      For the foregoing reasons, it is recommended that respondent's
22  motion to dismiss the petition be granted.
23
24  Dated: August 26, 2013
25                                          _____
                                            Andrew J. Wistrich
26                                          United States Magistrate Judge
27
28                                    66

```
 1
 2
 3
 4
 5
 6
 7
 8                   UNITED STATES DISTRICT COURT
 9                  CENTRAL DISTRICT OF CALIFORNIA
10                        WESTERN DIVISION
11
12  SIRHAN BISHARA SIRHAN,        )      Case No. CV 00-5686-BRO(AJW)
                                  )
13           Petitioner,          )
                                  )
14       v.                       )      [PROPOSED]
                                  )      JUDGMENT
15  P.D. BRAZELTON, Warden,       )
                                  )
16           Respondent.          )
    _____)
17
18       It is hereby adjudged that the petition for a writ of habeas
19  corpus is dismissed as untimely.
20
21  Dated: _____
22
                              _____
23                            Beverly Reid O'Connell
                              United States District Judge
24
25
26
27
28
```